CHIROPRACTORS FOR JUSTICE, Dr. Adrian Barber, Dr. Edward Barrington, Dr. Tom Gundelfinger, Dr. Lou Ann Hedden, Dr. Trevor Ireland, Dr. Kenneth Ketz, Dr. Eugene Kremer, Dr. Charles Krichbaum, Dr. Bobby Lucas, Dr. David Mullholland, Dr. Leland Olkjer, and Dr. Myron Schweigert, Appellants,

v.

STATE of Alaska and the Workers' Compensation Board of the State of Alaska, Appellees.

No. S–5648.

Supreme Court of Alaska.

May 19, 1995.

Paul L. Davis, Law Offices of Paul L. Davis and Associates, Anchorage, for appellants.

Robert A. Royce, Asst. Atty. Gen., Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellees.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

### ORDER

IT IS ORDERED, SUA SPONTE:

1. Opinion No. 4198, issued on May 12, 1995, is WITHDRAWN.

2. Opinion No. 4210, in which footnote # 17 at page 20 has been modified, is issued today in its place.

Entered by direction of the court at Anchorage, Alaska on May 19, 1995.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

Members of an organization called Chiropractors for Justice (CFJ) assert that the Alaska Workers' Compensation Act frequency-of-treatment statute and the corresponding regulation violate their federal and state guarantees of due process, equal protection and privacy. The superior court rejected CFJ's claims. We affirm.

### II. FACTS AND PROCEEDINGS

In 1988, as part of a comprehensive revision of the Alaska Workers' Compensation Act (Act), the Alaska Legislature adopted new procedures for payment of workers' compensation benefits for "continuing and multiple treatments of a similar nature." AS 23.30.095(c).[1] If the course of treatment requires continuing and multiple treatments of a similar nature, and will require more frequent outpatient visits than provided for by frequency standards specified by the Alaska Workers' Compensation Board (Board), the amended statute requires that the physician or health care provider submit a written treatment plan to the employer and employee within fourteen days after treatment begins. *Id.* The employer and employee are excused from paying for treatments exceeding the frequency standards if the physician or health care provider fails to furnish the treatment plan within fourteen days. *Id.*

The 1988 amendments also required the Board to adopt regulations establishing standards for frequency of treatment. *Id.* In response, the Board promulgated 8 Alaska Administrative Code (AAC) 45.082(f), which sets the standard for the maximum number of compensable treatments permitted without Board approval, and 8 AAC 45.082(g), which sets the procedure for Board approval of treatments exceeding the frequency standards.[2]

In 1990 CFJ filed suit against the State of Alaska (State), challenging AS 23.30.095(c) and 8 AAC 45.082(f) and (g). CFJ claimed the statute and the regulation violated its

---

1. AS 23.30.095(c) provides:

   A claim for medical or surgical treatment, *or treatment requiring continuing and multiple treatments of a similar nature* is not valid and enforceable against the employer unless, within 14 days following treatment, the physician *or health care provider* giving the treatment or the employee receiving it furnishes to the employer and the board notice of the injury and treatment, preferably on a form prescribed by the board. The board shall, however, excuse the failure to furnish notice within 14 days when it finds it to be in the interest of justice to do so, and it may, upon application by a party in interest make an award for the reasonable value of the medical or surgical treatment so obtained by the employee. *When a claim is made for a course of treatment requiring continuing and multiple treatments of a similar nature, in addition to the notice, the physician or health care provider shall furnish a written treatment plan if the course of treatment will require more frequent outpatient visits than the standard treatment frequency for the nature and degree of the injury and the type of treatments. The treatment plan shall be furnished to the employee and the employer within 14 days after treatment begins. The treatment plan must include objectives, modalities, frequency of treatments, and reasons for the frequency of treatments. If the treatment plan is not furnished as required under this subsection, neither the employer nor the employee may be required to pay for treatments that exceed the frequency stan-*

   *dard. The board shall adopt regulations establishing standards for frequency of treatment.* AS 23.30.095(c) (emphasis added to indicate 1988 amendments).

2. 8 AAC 45.082(f) provides, in part:

   [P]ayment for a course of treatment for the injury may not exceed more than three treatments per week for the first month, two treatments per week for the second and third months, one treatment per week for the fourth and fifth months, and one treatment per month for the sixth through twelfth months. Upon request, and in accordance with AS 23.30.095(c), the board will, in its discretion, approve payment for more frequent treatments.

   8 AAC 45.082(g) provides:

   The board will, in its discretion, require the employer to pay for treatments that exceed the frequency standards in (f) of this section only if the board finds that

   (1) the written treatment plan was given to the employer and employee within 14 days after treatments began;

   (2) the treatments improved or are likely to improve the employee's conditions; and

   (3) a preponderance of the medical evidence supports a conclusion that the board's frequency standards are unreasonable considering the nature of the employee's injury.

   In *Anchorage Sch. Dist. v. Hale*, 857 P.2d 1186 (Alaska 1993), we held that 8 AAC 45.082(f) was consistent with and thus authorized by AS 23.30.095(c).

members' rights to equal protection of law, due process of law, and privacy, and the Act's presumption of compensability. CFJ and the State cross-moved for summary judgment. The superior court rejected CFJ's challenges, granted summary judgment to the State on all counts, and entered final judgment for the State. CFJ's appeal raises the same arguments rejected by the superior court.

## III. DISCUSSION

### A. Standard of Review

■ In reviewing a grant of summary judgment, we determine whether a genuine issue of material fact exists and, if not, whether the moving party is entitled to judgment as a matter of law. *Gilbert v. State, Dep't of Fish and Game,* 803 P.2d 391, 394 (Alaska 1990). We consider matters of law *de novo* and adopt the rule of law which is most persuasive in light of precedent, reason and policy. *Id.* Constitutional questions are also questions of law to which we apply our independent judgment. *Municipality of Anchorage v. Leigh,* 823 P.2d 1241, 1243 n. 5 (Alaska 1992).

### B. Substantive Due Process

CFJ argues that AS 23.30.095(c) and 8 AAC 045.082(f) and (g) violate substantive due process because the frequency standard in 8 AAC 45.082(f) is arbitrary, bearing no fair and substantial relationship to a legitimate government purpose.

We have previously held:

Substantive due process is denied when a legislative enactment has no reasonable relationship to a legitimate governmental purpose. It is not a court's role to decide whether a particular statute or ordinance is a wise one; the choice between competing notions of public policy is to be made by elected representatives of the people. The constitutional guarantee of substantive due process assures only that a legislative body's decision is not arbitrary but instead based upon some rational policy.

A court's inquiry into arbitrariness begins with the presumption that the action of the legislature is proper. The party claiming a denial of substantive due process has the burden of demonstrating that no rational basis for the challenged legislation exists. This burden is a heavy one, for if any conceivable legitimate public policy for the enactment is apparent on its face or is offered by those defending the enactment, the opponents of the measure must disprove the factual basis for such a justification.

*Municipality of Anchorage v. Leigh,* 823 P.2d at 1244 (quoting *Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough,* 527 P.2d 447, 452 (Alaska 1974)). *See also Alaska Int'l Indus., Inc. v. Musarra,* 602 P.2d 1240, 1245 n. 9 (Alaska 1979) ("It is established that, in refusing to substitute its judgment for that of the administrative agency as to the efficacy of the regulation, this court will decline to review the 'wisdom' of a particular regulation.").

As the State argues, it had a legitimate interest in curbing abuse by health providers and claimants, discouraging needless or fruitless treatments, saving jobs by reducing workers' compensation premiums and, in general, ensuring the delivery of reasonable and necessary medical benefits to injured workers. Reducing amounts spent needlessly on health care also potentially translated to increased disability benefits for injured workers. Legitimate public purposes thus justified action by the legislative and executive branches of government.

Further, the State's action bears a reasonable relationship to those legitimate governmental purposes. There is a logical connection between limiting the process by which physicians and health care providers receive payment for repetitive, similar and frequent treatments and the legitimate governmental purposes noted above. A substantial relationship exists between the frequency standards and the State's objective of "ensur[ing] the quick, efficient, fair, and predictable delivery of indemnity and medical benefits to injured workers at a reasonable cost to the employers." Ch. 79, § 1, SLA 1988.

■ Moreover, information in the record supports adoption of frequency of treatment standards of the sort promulgated in 8 AAC

45.082(f). Supporting sources include workers' compensation standards employed by Florida, New York, and Washington, and medical and workers' compensation publications, one of which was published by the California Workers' Compensation Institute. Although CFJ argues that the Alaska standards do not precisely mirror those of Florida, New York, or Washington, CFJ does not dispute that certain aspects of the Alaska standards are similar to the standards of those states. Thus, factual support exists for the Board's selection of the specific standards in question, and therefore, the Board did not adopt the provision arbitrarily or capriciously.[3]

CFJ also cites a House Labor and Commerce Committee memorandum and affidavits by two members of the Governor's Oversight Group, criticizing a proposed bill which had included a frequency standard of twenty visits in the first sixty days—the exact number to be set by the Board in 8 AAC 45.082(f)—because "the provision impose[d] maximum limits arbitrarily." That history, however, cannot establish whether the legislature as a body considered such frequency limits to be arbitrary. *See* 2A Norman J. Singer, *Sutherland Statutory Construction* § 48.13, at 356 (5th ed. 1992 rev.) ("[I]t is impossible to determine with certainty what construction was put upon an act by the members of the legislative body that passed it by resorting to the speeches of individual members thereof. Those who did not speak may not have agreed with those who did; and those who spoke might differ from each other.") (quoting Peckham, J., in *United States v. Trans–Missouri Freight Ass'n,* 166 U.S. 290, 318, 17 S.Ct. 540, 550, 41 L.Ed. 1007 (1897)).[4]

Furthermore, the challenged regulation does not prohibit compensation for treatments whose frequency exceeds the standard; it merely requires the treating health care provider to meet the procedural prerequisites to receive payment for those treatments.[5]

At least one other state has upheld frequency standards on this basis. *See Kemp v. Workers' Compensation Dep't,* 65 Or.App. 659, 672 P.2d 1343 (1983), *modified on other grounds,* 67 Or.App. 270, 677 P.2d 725 (1984). In *Kemp,* the court held valid a frequency standard which provided for twenty-four office visits within the first sixty days and four visits per month thereafter, and which required that, upon request, physicians requesting reimbursements for visits in excess of that standard submit a plan of treatment containing objectives, measurement indicators, modalities, and frequency of treatments. *Id.* at 1344–45 & n. 1. The court stated:

**3.** CFJ focuses its argument on two sources cited by the Board: (1) testimony of Scott Haldeman, M.D., Ph.D., whose alleged opinions were conveyed to the Board by another person; and (2) Richard Olson, D.C., *PROCEDURAL/UTILIZATION FACTS: Chiropractic/Physical Treatment Standards* (2d ed.).

Because the substance of neither source is contained in the record, we cannot conclude that the Board's reliance on either was unwarranted. However, CFJ's brief sets out Dr. Olson's "typical chiropractic treatment pattern." That pattern is remarkably similar to the frequency standards adopted by the Board, and thus clearly supports the regulation. *See* 8 AAC 45.082(f). Dr. Olson subsequently objected to the Board's use of his book for purposes of adopting the regulation, but his objection post-dated adoption of the regulation. Even if the Board had known of Dr. Olson's objections, it could have concluded that Dr. Olson's treatment pattern was relevant to the question of appropriate frequency standards.

**4.** *See Dep't of Community and Regional Affairs v. Sisters of Providence in Washington,* 752 P.2d 1012, 1015 n. 7 (Alaska 1988) ("[S]ubsequent testimony of even the prime sponsor of a bill as to either his own understanding or the legislature's understanding of the meaning of the bill should not be considered by a court in construing legislative intent. We do not wish to transform statutory construction into a parade of legislators' affidavits containing their perceptions of the meaning of a bill." (quoting *Alaska Public Employees' Ass'n v. State,* 525 P.2d 12, 16 (Alaska 1974))); *Lynden Transport, Inc. v. State,* 532 P.2d 700, 716 (Alaska 1975) ("When a law has been enacted, the legislature has spoken as a whole, and the recollections of an individual legislator as to what was intended are irrelevant to a determination of a legislative intent.").

**5.** If the frequency standard set forth in 8 AAC 45.082(f) is exceeded, physicians or health care providers must meet the prerequisites listed in 8 AAC 45.082(g) to receive payment for their services under the Act. *See supra* n. 2 for text of 8 AAC 45.082(g).

We find nothing in this or any other statute that authorizes any limitations on the number of treatments that a claimant can receive. If this administrative rule actually permits a limitation of the treatment which a claimant can receive, it is not authorized by the statute. We agree however with the Director's argument that the rule does not limit treatment but merely requires that, if the treatment exceeds the prescribed number of visits, the physician must submit a report justifying further treatment. That is consistent with the legislative policy of requiring medical service to be provided only for the period of time necessary for recovery.

*Id.* at 1345–46. Thus, the court concluded that the rule was valid insofar as it only required submission of a report justifying treatments in excess of the frequency standard.[6] *Id.* Although Alaska's frequency standards may be slightly more confining than those of Oregon,[7] the procedural safeguards for receiving payment for treatment in excess of the frequency standards are essentially the same as those upheld in *Kemp.*

■ We conclude that the statute and the regulation bear a reasonable relationship to a legitimate governmental purpose. We also note that there was factual support for the statute and regulation. We consequently reject CFJ's substantive due process challenge to the statute and the regulation.

### C. *Equal Protection*

#### 1. *Sliding scale of review*

■ CFJ argues that AS 23.30.095(c) and 8 AAC 45.082(f) and (g) violate Article I,

section 1 of the Alaska Constitution because they unlawfully discriminate against chiropractors.[8] Because Alaska's equal protection clause may be more protective of individual rights than the federal equal protection clause, the analysis here will focus on the state constitution. *See State v. Anthony,* 810 P.2d 155, 157 (Alaska 1991); *Sonneman v. Knight,* 790 P.2d 702, 706 (Alaska 1990).

■ In analyzing equal protection issues, we employ a "sliding scale of review ranging from relaxed scrutiny to strict scrutiny." *State v. Ostrosky,* 667 P.2d 1184, 1192–93 (Alaska 1983). In applying the sliding scale analysis, this court proceeds through three distinct analytic stages:

> First, it must be determined at the outset what weight should be afforded the constitutional interest impaired by the challenged enactment. The nature of this interest is the most important variable in fixing the appropriate level of review.... Depending upon the primacy of the interest involved, the state will have a greater or lesser burden in justifying its legislation.
>
> Second, an examination must be undertaken of the purposes served by a challenged statute. Depending on the level of review determined, the state may be required to show only that its objectives were legitimate, at the low end of the continuum, or, at the high end of the scale, that the legislation was motivated by a compelling state interest.
>
> Third, an evaluation of the state's interest in the particular means employed to

6. Subsequent to *Kemp,* the Oregon Court of Appeals addressed the applicability of the standards to particular cases, and reversed the Oregon Workers' Compensation Board's decisions to limit compensation for "reasonable and necessary" treatments which exceeded the frequency standard. *See, e.g., West v. SAIF Corp.,* 74 Or.App. 317, 702 P.2d 1148, 1149 (1985) (reversing Board's decision denying compensation for chiropractic visits exceeding the frequency standards because "claimant has established that his chiropractic treatments are reasonable and necessary to relieve him of severe pain and to permit him to work").

7. Under 8 AAC 45.082(f), the frequency standard is as follows: "three treatments per week for the

first month, two treatments per week for the second and third months, one treatment per week for the fourth and fifth months, and one treatment per month for the sixth through twelfth months;" whereas, the Oregon standard provided for twenty-four office visits in the first sixty days from the first day of treatment and four visits per month thereafter. *Kemp,* 677 P.2d at 1344–45.

8. Article I, section 1 of the Alaska Constitution provides in part: "all persons are equal and entitled to equal rights, opportunities, and protection under the law." Alaska Const., art. I, § 1.

further its goals must be undertaken. Once again, the state's burden will differ in accordance with the determination of the level of scrutiny under the first stage of analysis. At the low end of the sliding scale, we have held that a substantial relationship between the means and the ends is constitutionally adequate. At the higher end of the scale, the fit between means and ends must be much closer.

*Alaska Pacific Assur. Co. v. Brown*, 687 P.2d 264, 269–70 (Alaska 1984) (citations omitted).

### 2. Applying the sliding scale analysis

### a. Constitutional interest/level of scrutiny

CFJ argues that the statute and regulation infringe on a fundamental interest, the physician-patient relationship, and consequently require a "very high level of justification." *See Falcon v. Alaska Public Offices Comm'n*, 570 P.2d 469, 476 (Alaska 1977). The State responds that they affect only an economic or commercial interest, and are therefore only subject to the lowest level of scrutiny. *See Herrik's Aero–Auto–Aqua Repair v. Dep't of Transp.*, 754 P.2d 1111, 1114 (Alaska 1988) (citing *Isakson v. Rickey*, 550 P.2d 359, 363 (Alaska 1976) (noting that legislation of economic and commercial interest is traditionally subject to the lowest level of scrutiny)).

■ As the State correctly notes in its brief, the most precise description of the constitutional interest implicated here is "the right of a health care provider to receive payment under the Workers' Compensation Act for continuing multiple treatments in excess of the frequency standards without administrative review." The regulation does not interfere with the doctor-patient relationship. It merely prescribes the procedures under which a physician may seek payment under the Act. Thus, the interest at issue is merely an economic one, entitled to the minimum level of judicial scrutiny.

CFJ argues that, at the very least, the interest implicated here should be characterized as "important" because the care providers' right to engage in an economic endeavor in a particular industry is threatened. In *State v. Enserch Alaska Constr., Inc.*, 787 P.2d 624, 633 (Alaska 1989), we held that although a statute providing that a hiring preference be given to residents of economically distressed zones for contracts involving public works projects did not result in a total deprivation of employment, it nevertheless impaired "the important right to engage in economic endeavor," thereby requiring us to "closely scrutinize the law." *Id.* The interest asserted in *Enserch*, however, is different from the one asserted here.

The statute in *Enserch* completely foreclosed some members of a class of persons from participating in an economic endeavor. In contrast, the statute and regulation challenged here do not prohibit chiropractors from treating or contracting with any patient. The only interest implicated here is economic, and does not rise to the level of the interest asserted in *Enserch*. We consequently apply the minimum level of judicial scrutiny to the statute and regulation.[9]

### b. Purposes furthered by the statute and regulation

■ Because CFJ's interest is entitled only to a minimal level of constitutional protection, in the second stage of the equal protection analysis the State must show only that its objectives were legitimate. *Brown*, 687 P.2d at 269. We consider the challenged provisions in light of the purposes of the entire Act and the 1988 amendments. *Taylor v. Southeast–Harrison Western Corp.*, 694 P.2d 1160, 1162 (Alaska 1985).

The State asserts that the legislature's intent in enacting AS 23.30.095(c) is clear. In *Leigh* we concluded that the legislature's in-

9. *See, e.g., Anthony*, 810 P.2d at 158 (holding right to receive permanent fund dividend is economic interest entitled to minimum protection under state equal protection analysis); *Sonneman*, 790 P.2d at 705 (holding right to receive unemployment benefits entitled to review at low end of scale); *Herrik's Aero–Auto–Aqua Repair*, 754 P.2d at 1114 (holding requirement airplane mechanics have insurance and permit implicated purely economic interests subject to lowest level of scrutiny); *Wilson v. Municipality of Anchorage*, 669 P.2d 569, 572 (Alaska 1983) (holding interest in suing the government is not fundamental, and afforded only minimal protection under equal protection analysis); *Isakson v. Rickey*, 550 P.2d at 363 (holding the right to a limited entry fishing permit is subject to lowest level of scrutiny).

tent in enacting AS 23.30.265(21) was clear. *Leigh*, 823 P.2d at 1244. In support, we quoted from the 1988 act amending chapter 30:

> Section 1 of the 1988 amendments to the Act provides: "(a) It is the intent of the legislature that AS 23.30 be interpreted so as to ensure the quick, efficient, fair and predictable delivery of indemnity and medical benefits to injured workers at a *reasonable cost* to the employers who are subject to the provisions of AS 23.30." [10]

*Leigh*, 823 P.2d at 1244–45 (citing Ch. 79, § 1, SLA 1988 and adding emphasis). *See also Rydwell v. Anchorage School Dist.*, 864 P.2d 526, 530 (Alaska 1993). This purpose comports with the overall purpose of the Act, "the provision of financial and medical benefits for victims of work-connected injuries in the most efficient, most dignified, and most certain form." *Arctic Structures, Inc. v. Wedmore*, 605 P.2d 426, 437 (Alaska 1979).

The State maintains that ample evidence in the record supports the premise that the legislature's intent in enacting the frequency standards was to further the overall legislative policy of providing medical benefits to injured workers at a reasonable cost to employers.[11] The State cites legislative testimony given by John Lewis, a nationally recognized expert in workers' compensation legislation, who stated that the legislature could control rising workers' compensation costs was by regulating "the amount of medical care that's provided, the frequency, the duration." The State also quotes Dick Cattanach, a member of the Workers' Compensation Committee, who testified:

> [C]ontinuing multiple treatments is an area that caused a lot of trouble because when we looked at medical costs, the medical costs went from about 25 percent of the premium dollar in 1983 to 37½ percent of the premium dollar in 1986. . . . We tried to pose controls in two manners: One is the cost of the actual service, the second is the frequency of visits.

The State maintains that in an attempt to meet the concerns regarding rising workers' compensation costs, the legislature enacted AS 23.30.095(c) and the Board subsequently promulgated 8 AAC 45.082(f) and (g), establishing additional standards and procedures to eliminate unnecessary treatment.

---

10. In *Leigh* this court noted that the asserted legislative intent is bolstered by a letter of intent contained in the Senate Journal which provides:

> With an actuarial analysis concluding that this bill will provide a two percent savings in hard costs and an unquantifiable amount of soft dollar savings, it is the intent of the Alaska State Senate that, upon passage of this bill, the Division of Insurance request a new rate filing reflecting a reduction in workers' compensation premiums.

823 P.2d 1241, 1244 n. 8 (citing 1988 Senate Journal 2420). This court further noted that "[a] report of the Workers's Compensation Labor–Management Task Force also chronicled the increase in workers' compensation insurance costs" and that "[t]his task force was resurrected in 1986, following a rate increase by the Department of Workers' Compensation Insurance 'with the purpose of reducing rates paid by employers through legislative changes to the Statute.'" *Id.* (quoting Workers' Compensation Labor–Management Task Force, Synopsis of Proposed Legislative Changes to Chapter 30 of Title 23, at 1).

11. CFJ devotes a substantial portion of its opening brief to arguing that some of the parties involved in seeking enactment of the law and construction of the regulation were personally biased against chiropractors and set out to create specific limitations on chiropractic services. The State contends that "CFJ's attempt to rehash the motives behind the enactments are improper [because] [i]t is well established that the validity of a statute or regulation does not depend upon the motivations of the authors." (citing *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *County of Los Angeles v. Superior Court*, 13 Cal.3d 721, 119 Cal.Rptr. 631, 635, 532 P.2d 495, 499 (1975) (en banc); *Rhode Island Liquor Stores Ass'n v. Evening Call Pub. Co.*, 497 A.2d 331, 335 (R.I.1985) (holding that even if invalid motives are behind what becomes a valid enactment, a law will not be invalidated); 2A Norman J. Singer, *Sutherland Statutory Construction* § 45.11 (5th ed. 1992 rev.)).

Neither CFJ nor the State is entirely correct. CFJ's allegations regarding a bias against chiropractors are relevant, but only to the extent that they undermine the State's contention that the purpose of the amendment and related regulation is legitimate, i.e., to control costs, and not merely to pursue an economic assault on chiropractors. In addressing this issue, this court must bear in mind that "[w]hen a law has been enacted, the legislature has spoken as a whole." *Lynden Transport, Inc. v. State*, 532 P.2d 700, 716 (Alaska 1975). Thus, the general purpose behind the statute and regulation is at issue, not the respective motives of individual drafters.

CFJ argues that there is no need for new legislation because there is no evidence that a problem existed with the medical costs portion of the workers' compensation system, and no evidence that the new legislation requiring frequency standards would be more effective in curbing abuse than the standard—that the treatment be medically reasonable and necessary—already offered by the system. CFJ alleges that the testimony given by Cattanach was false, and thus, should not have been relied upon by the legislature.[12] CFJ further argues that because "no statistics [were] kept of abuses in general or abuses of the type of treatment sought to be regulated by the frequency of treatment provisions," the new statute and regulation could not have been intended to reduce costs by curbing abuse. CFJ cites *McLean v. Arkansas Bd. of Educ.*, 529 F.Supp. 1255, 1263–64 (E.D.Ark.1982), for the proposition that this court is not bound by the legislature's express statement of purpose where, after reviewing the circumstances surrounding the enactment of a law, it is obvious that the legislature's statement of purpose "has little, if any, support in fact." CFJ also argues that some of the statements made by Bob Anders[13] suggest a personal prejudice against chiropractors.

The record as a whole nonetheless supports the legislative statement of purpose. The record contains evidence supporting the State's contention that the legislature's main purpose in enacting the frequency standards was to ensure the delivery of medical services at "a reasonable cost to the employers," and not to discriminate against chiropractors. John Lewis' testimony, although questioned to some extent by CFJ,[14] indicated that one method of controlling workers' compensation costs was to regulate the frequency and duration of treatment. Thus, the legislative intent expressed in section 1 of the 1988 amendments and quoted above is supported by the record. Ch. 79, § 1, SLA 1988.

CFJ relies on *Brown*, 687 P.2d 264, to argue that the State's interest in reducing costs is invalid. In *Brown*, we held that a statute adjusting benefits of workers' compensation recipients who move out of state was unconstitutional. In particular, we held that,

> the asserted goal of lowering insurance premiums can have no independent force in the state's attempt to meet its burden under the equal protection clause. Although reducing costs to taxpayers or consumers is a legitimate government goal in one sense, savings will always be achieved by excluding a class of persons from benefits they would otherwise receive. Such economizing is justifiable only when effected through independently legitimate distinctions.

*Brown*, 687 P.2d at 272 (footnote omitted).

CFJ's reliance on *Brown* is misplaced. Unlike the situation in *Brown*, the statute and regulation here are not designed to reduce costs by depriving a certain class of persons, e.g., chiropractors, of benefits they would otherwise receive. Rather, they are designed to reduce costs by curbing perceived abuses through procedural safeguards. Chiropractors may be paid for frequent treatments by adhering to the regulation and demonstrating that the treatments are reasonable and necessary. The purpose here was to ensure that employers are liable only for reasonable and necessary medical costs. *See* ch. 79, § 1, SLA 1988 and AS 23.30.265(20).

**12.** In particular, CFJ takes issue with the portion of Cattanach's testimony in which he stated that the Task Force had spoken to a chiropractor who had previously testified before the Board, regarding the proposed frequency standards. CFJ alleges that the testimony was false and misleading.

**13.** Anders was a member of the "Labor/Management Ad Hoc Committee" (also known as the Management/Labor Joint Task Force) which drafted the initial bill regarding frequency standards.

**14.** CFJ argues that when Lewis testified that the medical costs in Alaska represented thirty-eight percent of total workers' compensation costs in Alaska, he incorrectly included rehabilitation costs as part of the medical costs. Actually, Jacqueline McClintock, Director of the Workers' Compensation Division, stated that the question should be addressed to the Division of Insurance, but that "it's *my* understanding that some of those [medical] costs *probably* include[d] *some* rehabilitation costs." (Emphasis added.) Thus, CFJ's contention is, at best, questionable.

c. *Nexus between the means and the ends*

When the interest affected is entitled to only minimal judicial protection, the State need only show that the distinction [15] drawn bears a fair and substantial relationship to the Act's objective. *Brown*, 687 P.2d at 269–70; *Sonneman*, 790 P.2d at 705. In *State v. Anthony*, 810 P.2d 155, we stated that "[d]espite the language in *Isakson v. Rickey*, 550 P.2d [at 362], indicating this court's lower level of scrutiny will be more rigorous and less deferential than the federal rational basis test, we have invalidated only two legislative enactments under the fair and substantial relationship test since *Isakson*." [16] *State v. Anthony*, 810 P.2d at 159.[17]

CFJ's arguments regarding the third step in the equal protection analysis overlap its substantive due process claims. *See Leigh*, 823 P.2d at 1247 n. 15. For the same reasons discussed above in rejecting CFJ's substantive due process claim, we conclude that the provisions do not violate the constitutional guarantee of equal protection. The challenged provisions bear a fair and substantial relationship to the State's objective of "ensur[ing] the quick, efficient, fair and predictable delivery of indemnity and medical benefits to injured workers at a *reasonable* cost to the employers." Ch. 79, § 1, SLA 1988 (emphasis added).

D. *Privacy*

CFJ next argues that the provisions violate privacy rights on the theory they unconstitutionally infringe upon the physician-patient relationship. CFJ relies primarily on *Falcon v. Alaska Public Offices Comm'n*, 570 P.2d 469, 480 (Alaska 1977), where we held unconstitutional a statute requiring physicians running for public office to disclose the names of their patients for the purpose of discovering conflicts of interest.

The physician-patient relationship is invaded by these provisions only to the extent necessary to administer the workers' compensation program. The right to privacy is not absolute. Rather, "it is part of the judicial function to ensure that governmental infringements of this right are supported by sufficient justification." *Id.* at 477. The State must be able to investigate the validity of a health care provider's claim for payment under the Act if the State is to administer effectively the benefits program. As this court has previously held, "there must be ... a balancing of conflicting rights and interests." *Messerli v. State*, 626 P.2d 81, 83 (Alaska 1980). Here, the balance clearly weighs in favor of the State's interest in preventing fraud and abuse in the worker's compensation system.

It is also difficult to comprehend any limit to CFJ's privacy argument. There is no

---

**15.** The statute and regulation do not expressly distinguish between classes of medical professionals. The distinction is between those health care providers, which may include some chiropractors, who generally provide continuous, multiple and relatively frequent treatments, and other health care providers whose treatments would not normally exceed the frequency standard guidelines.

**16.** Those two cases were *Gilman v. Martin*, 662 P.2d 120 (Alaska 1983), and *Turner Constr. Co., Inc. v. Scales*, 752 P.2d 467 (Alaska 1988). In *Gilman*, this court struck down a Kenai Peninsula Borough ordinance which limited participants in a land sale lottery to those who had resided in the borough for at least a year. *Id.* at 125–26. We concluded that the residency requirement did not bear a fair and substantial relationship to the purpose of the lottery—selling "certain parcels of Borough selected lands ... to adjoining property owners or to leaseholders so as to resolve exist-

ing controversies regarding access and title." *Id.* at 126.

In *Turner*, we invalidated a statute barring legal action against design professionals such as architects, engineers and contractors more than six years after substantial completion of an improvement to real property. 752 P.2d at 472. We held that "there is no substantial relationship between exempting design professionals from liability, shifting liability for defective design and construction to owners and material suppliers, and the goal of encouraging construction," because the shift in liability actually provides a disincentive to owners to finance construction as the owners would be subjected to liability for a product over which they had no control. *Id.*

**17.** Since deciding *State v. Anthony*, we struck down the gross weekly wage determination method of AS 23.30.220(a) under the fair and substantial relationship test in *Gilmore v. Alaska Workers' Compensation Board*, 882 P.2d 922, 929 (Alaska 1994).

privilege or right of privacy with respect to the substance and cost of medical services for which an employer is assertedly liable under the Act. AS 23.30.095(h). *See* Arthur Larson, *The Law of Worker's Compensation* § 79.83(c), at 15–508 (1993) ("[t]he physician-patient privilege not only is of doubtful utility, but because of the high proportion of cases in which declarations to physicians are indispensable links in the testimony, it is capable of working severe injustice.") (footnotes and citations omitted). To accept CFJ's argument would make it impossible to controvert and decide any claim for medical services under the Act, and would be fundamentally contrary to Alaska's statutory scheme for indemnifying employees injured in the course of their employment.

### E. *Presumption of Compensability*

 Finally, CFJ argues that 8 AAC 45.082(g) violates the "presumption of compensability" contained in AS 23.30.095(a). CFJ asserts that by requiring the employee to prove that "the treatments improved or are likely to improve the employee's conditions," 8 AAC 45.082(g)(2) nullifies the presumption by shifting responsibility to the employee to establish justification for payment.

CFJ's argument is without merit. AS 23.30.095(a) does not guarantee unlimited medical benefits regardless of whether the treatments are beneficial. The Act is intended to provide medical and related benefits "as may reasonably be required which [arise] out of or [are] necessitated by an injury." AS 23.30.265(20). The statute containing the "presumption" cited by CFJ only requires the employer to furnish "treatment ... for the period which the nature of the injury or the process of recovery requires...." AS 23.30.095(a). An employer is not required to furnish treatments which are unreasonable or unnecessary. The provisions under attack do not limit compensability; they merely establish a mechanism by which the Board may monitor the reasonableness of the treatments.

In any event, having enacted AS 23.30.095(a) in the first place, the legislature had the power to narrow any presumption found in that subsection when it enacted AS 23.30.095(c) in 1988 and required the Board to adopt frequency of treatment standards. *Leigh,* 823 P.2d at 1246–47.

## IV. *CONCLUSION*

For these reasons, we conclude that the superior court correctly denied summary judgment to CFJ and correctly granted summary judgment to the State upholding AS 23.30.095(c) and 8 AAC 45.082(f) and (g). We therefore AFFIRM the judgment of the superior court.