**Ray BOCKNESS, Appellant,**

v.

**BROWN JUG, INC., Alaska National Insurance Company, and The Alaska Workers' Compensation Board, Appellees.**

No. S-8550.

Supreme Court of Alaska.

May 28, 1999.

---

**2.** *See* Op. at 461.

William J. Soule, Law Office of William J. Soule, Anchorage, for Appellant.

Theresa Hennemann, Holmes, Weddle & Barcott, Anchorage, for Appellees Brown Jug, Inc. and Alaska National Insurance Company.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Justice.

### I. INTRODUCTION

Ray Bockness appeals the partial denial of workers' compensation benefits for a work-related back injury. The Alaska Workers' Compensation Board found that Bockness's employer, Brown Jug, Inc., did not need to pay for chiropractic treatments beyond those authorized by 5 AAC 45.082 or for more than

six weeks of injection therapy. The superior court affirmed. Because the Board correctly applied the law to Bockness's claim and because substantial evidence exists to support the Board's decision, we affirm.

## II. *FACTS AND PROCEEDINGS*

Ray Bockness, an employee of Brown Jug, Inc., was injured in a work-related accident on March 23, 1993.[1] As Bockness was unloading beverages from a truck, the ramp on which he was standing collapsed, leaving Bockness hanging from the truck with one hand and holding onto a loaded hand truck with the other. Bockness suffered a back injury in the accident. He returned to part-time work on April 7, 1993, but his doctor restricted him to light duty work (lifting only up to twenty-five pounds). Bockness slowly returned to full-time work but continued to take time off due to back pain.

Bockness first visited Dr. Loren Morgan, a chiropractor, the day following the accident. Dr. Morgan diagnosed Bockness with a "strain/sprain complex involving both the muscle and the ligament" and started a regimen of chiropractic adjustments. Dr. Morgan's original treatment plan called for two weeks of daily treatment, three weekly appointments for the following four to eight weeks, and then two weekly treatments for the following two to four weeks. Dr. Morgan repeatedly submitted this treatment plan to Brown Jug in accordance with AS 23.30.095(c).[2]

On April 9, 1993, Brown Jug controverted Dr. Morgan's treatments to the extent that they exceeded the frequency standards set out in 8 AAC 45.082(f).[3] In December 1993 Brown Jug arranged for Drs. Charles D. Potter and Richard L. Peterson to perform an independent medical evaluation (IME) for Bockness. Dr. Shawn Hadley performed a second IME in March 1994. All three physicians recommended that Dr. Morgan's chiropractic adjustments be discontinued.

Bockness continued to experience pain, at times severe. He also suffered from periods of incontinence. Thus, despite the recommendations of the IME panel and of Dr. Hadley, Bockness continued his chiropractic care with Dr. Morgan. Along with his own treatment, Dr. Morgan also made several referrals for Bockness, including a referral to Dr. Glenn Ferris, a physician specializing in physical medicine and pain management. Dr. Ferris first saw Bockness on May 11, 1994 and began a treatment protocol of physical therapy, pain medication, and a series of trigger point and epidural injections. These treatments are considered by the medical community to be controversial. Dr. Morgan also referred Bockness to Health Beat of Alaska for active physical therapy, but the treatments were discontinued at Dr. Morgan's request when Bockness's pain increased. Dr. Morgan told Health Beat that he felt the injection therapy would provide greater benefit to Bockness than would continued physical therapy; accordingly, Bockness continued with chiropractic care from

---

**1.** The parties agree that the injury was work related.

**2.** Alaska Statute 23.30.095(c) states in part:

When a claim is made for a course of treatment requiring continuing and multiple treatments of a similar nature, ... the physician or health care provider shall furnish a written treatment plan if the course of treatment will require more frequent outpatient visits than the standard treatment frequency for the nature and degree of the injury and the type of treatments. The treatment plan shall be furnished to the employee and the employer within 14 days after treatment begins. The treatment plan must include objectives, modalities, frequency of treatments, and reasons for the frequency of treatments. If the treatment plan is not furnished as required under this subsection, neither the employer nor the employee

may be required to pay for treatments that exceed the frequency standard.

**3.** 8 Alaska Administrative Code (AAC) 45.082(f) (1998) reads as follows:

If an injury occurs on or after July 1, 1988, and requires continuing and multiple treatments of a similar nature, the standards for payment for frequency of outpatient treatment for the injury will be as follows. Except as provided in (h) of this section, payment for a course of treatment for the injury may not exceed more than three treatments per week for the first month, two treatments per week for the second and third months, one treatment per week for the fourth and fifth months, and one treatment per month for the sixth through twelfth months. Upon request, ... the board will, in its discretion, approve payment for more frequent treatments.

Dr. Morgan combined with Dr. Ferris's injection protocol.

Dr. Hadley examined Bockness again at Brown Jug's request in May 1994. She concluded that further chiropractic care and injection therapy were not medically indicated. Based on the opinions of Drs. Potter, Peterson, and Hadley, Brown Jug filed another controversion notice, this time challenging all further chiropractic treatment, prescription medications, and epidural and trigger point injections. Dr. Morris R. Horning performed an IME following this notice, and concluded that no further chiropractic care was necessary and that injection therapy should be limited to six weeks in duration.

The Alaska Workers' Compensation Board held a hearing on July 10, 1996. The Board found that Bockness became medically stable by December 4, 1993, but suffered a setback and reverted to medical instability between May 25, 1994 and August 2, 1994. Accordingly, the Board awarded Bockness temporary total disability benefits for the time periods in which he was medically unstable. The Board also determined that Brown Jug was responsible for Dr. Morgan's chiropractic adjustments only to the extent they did not exceed the statutory frequency standards. The Board additionally limited Brown Jug's responsibility to six weeks of Dr. Ferris's treatments. The Board assigned Bockness a partial permanent impairment (PPI) rating and awarded him attorney's fees and costs.

Bockness appealed this decision and appeared before the Board once more on March 27, 1997. The second Board decision corrected a typographical error, adjusted Bockness's PPI rating, and addressed issues of offset, overpayment, and attorney's fees but did not make any adjustments to the original determinations of medical benefits.

Bockness appeals the partial denial of his medical benefit claims in the Board's first decision.

---

4. See *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992).

5. *Grove v. Alaska Constr. & Erectors*, 948 P.2d 454, 456 (Alaska 1997) (quoting *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1046 (Alaska 1978)).

---

## III. STANDARD OF REVIEW

 We do not defer to the superior court when it acts as an intermediate court of appeal; instead, we review independently the decisions of administrative agencies.[4] We review agency findings under a substantial evidence standard, asking whether those findings are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[5] We review questions of law under the independent judgment standard, adopting the rule of law most persuasive in light of reason, precedent, and policy.[6]

## IV. DISCUSSION

A. *The Workers' Compensation Act Requires Reimbursement Only for Reasonable and Necessary Medical Expenses.*

Bockness's primary argument is that Brown Jug must pay for all of Bockness's treatments because they helped him move from a medically unstable condition to a medically stable one. Relying on AS 23.30.395's definition of medical stability as "the date after which further objectively measurable improvement from the effects of the compensable injury is not reasonably expected to result from additional medical care or treatment,"[7] Bockness claims that "[s]ome kind of medical treatment is necessary, as a matter of law, to achieve medical stability." Bockness reasons that the treatments administered by Dr. Ferris and Dr. Morgan during the period of medical instability—May 25, 1994 to August 2, 1994—actually helped him move to a medically stable condition and therefore are compensable. He argues that it was irrational for the Board to determine that he would not recover from his injury without medical care and then to refuse to pay for "the only medical care he actually received … from 6/22/94 through 8/2/94." He argues that affirming the Board's deci-

---

6. See *Grove*, 948 P.2d at 456 (citing *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

7. AS 23.30.395(21).

sion would be tantamount to a total denial of medical care during that time period.

Brown Jug responds to this argument by asserting that Bockness's rights under the Workers' Compensation Act do not include the right to receive unlimited medical benefits of the employee's choosing but rather only to receive medical care that is "reasonable and necessary" as determined by the Board. Brown Jug argues that the Board's decision was not a blanket denial of medical care; instead, the Board simply authorized Brown Jug to refuse to pay for medical care that the Board found to be not medically reasonable or necessary past June 22, 1994. We agree.

The Board did not deny coverage for any and all medical care to Bockness during his period of medical instability. Rather, it determined that Bockness's chosen course of treatment—chiropractic care that exceeded statutory frequency standards, together with Dr. Ferris's controversial injection therapy— was neither reasonable nor necessary. In fact, the Board found some of the medical care obtained during his period of medical instability—May 25, 1994 through August 2, 1994—to be medically indicated. It only found that a portion of these treatments— those occurring after June 22—were unnecessary. This first month's worth of treatments could have been the crucial factor in Bockness's move toward medical stability.

While the Workers' Compensation Act may require employers to authorize *some* medical care during periods of medical instability as Bockness claims, the Act does not require employers to pay for any and all treatments chosen by the injured employee. Although no single provision states that all medical treatments must be reasonable and necessary, at several points in the Alaska Workers' Compensation Act the statutes make reference to that concept. Alaska Statute 23.30.395 defines "medical and related benefits" as those "physicians' fees, nurses' charges, hospital services, hospital supplies, medicine and prosthetic devices, physical rehabilitation, and treatment for the fitting and training for use of such devices *as may reasonably be required which arises out of or is necessitated by an injury*." [8] Furthermore, the Act itself states that employers are responsible only for providing that medical care and those services "which the nature of the injury or the process of recovery requires." [9] Moreover, in its provisions for independent medical examinations by the Board, the Act lists "the amount and efficacy of the continuance of or necessity of treatment" as a proper subject for Board inquiry and evaluation. [10] This provision indicates that the Board's proper function includes determining whether the care paid for by employers under the Act is reasonable and necessary.

Decisions of this court further support the view that considerations of reasonableness and necessity may limit the compensation due to an employee under the Act. We have stated that the state's interests in passing the Act and associated regulations include the "legitimate interest in curbing abuse by health providers and claimants, discouraging needless or fruitless treatments ... and, in general, ensuring the delivery of *reasonable and necessary medical benefits* to injured workers." [11] The text of the Act itself, along with this judicial interpretation, indicates that Alaska's statutory scheme limits an employer's responsibility to medical care that is reasonable and necessary.

Wholesale adoption of Bockness's theory is also troubling on policy grounds. Under his theory, employers would be obliged to pay

---

8. AS 23.30.395(20) (emphasis added).

9. AS 23.30.095(a). Bockness, without explanation, asserts that adoption of his position "will support and sustain" several provisions of the Act, including this section. But since this section by its terms refers to necessary medical care, it is unclear how this section supports Bockness's position. Bockness also cites to AS 23.30.095(c) (requiring submission of treatment plans to the Board for continuing and multiple treatments), AS 23.30.120 (presumption of compensability),

and AS 23.30.395(21) (definition of medical stability), but does not explain how requiring employers to fund all medical care—even if not reasonable or necessary—will further the statutory intent of these sections.

10. AS 23.30.095(k).

11. *Chiropractors for Justice v. State*, 895 P.2d 962, 966 (Alaska 1995) (emphasis added).

for any and all treatment chosen by the employee, no matter how experimental, medically questionable, or expensive it might be, as long as it was obtained during a period of medical instability after which the claimant eventually showed improvement. Such a result would be inconsistent with the Act's goal of keeping medical costs stable and reasonable.[12] Accordingly, we reject Bockness's argument that employers must pay for any treatment obtained during a temporary period of medical instability.

Of course, an employer cannot arbitrarily deny payment for benefits or refuse compensation without notifying the employee in advance that it is contesting certain medical care. Here, Brown Jug repeatedly notified Bockness that it would refuse to pay for these benefits; Brown Jug filed a series of controversion notices, the first in April 1993. Thus, we are not presented with a situation in which an employee suddenly is left to pay for medical expenses without adequate notice that the employer did not consider them reasonable and necessary. And, as we discuss below, Brown Jug presented ample medical evidence to meet its burden of showing that the treatments Bockness chose were not in fact reasonable or necessary.

B. *The Board's Decision Was Supported by Substantial Evidence.*

Bockness challenges the Board's findings that the treatments he received from Drs. Morgan and Ferris between June 22, 1994, and August 2, 1994 were not reasonable and necessary. First, the Board found that Dr. Morgan's chiropractic treatments over and above the treatment frequencies in 8 AAC 45.082(f)[13] were not justified. Second, the Board found that the injection therapy provided by Dr. Ferris, along with some diagnostic testing he referred Bockness to, should have been limited in duration to six rather than nine weeks. Accordingly, the Board found the last three weeks of injections not compensable.

1. *The Board appropriately limited chiropractic care to the treatment frequencies in 8 AAC 45.082(f).*

Bockness argues with respect to Dr. Morgan's continuing chiropractic adjustments that the Board committed reversible error "by limiting Dr. Morgan's treatments to the rigid limits set forth in" 8 AAC 45.082(f) given that "[n]ot every one heals at the same speed" and that Bockness had several serious exacerbations of his back injury. Bockness believes that the Board "took the 'frequency of treatments standards,' apparently meant to be an 'average' treatment standard, and turned them into the absolute maximum limit." These claims are without merit.

■ 8 AAC 45.082(g) states:

The board will, in its discretion, require the employer to pay for treatments that exceed the frequency standards in (f) of this section only if the board finds that (1) the written treatment plan was given to the employer and employee within 14 days after treatments began; (2) the treatments improved or are likely to improve the employee's conditions; and (3) a preponderance of the medical evidence supports a conclusion that the board's frequency standards are unreasonable considering the nature of the employee's injury.

This provision is an essential part of the frequency standards regulation.[14] This court recently addressed the purposes and design of the statutory frequency guidelines in *Chiropractors for Justice v. State*.[15] We explained that the frequency standards regulation "does not prohibit compensation for treatments whose frequency exceeds the

12. *See id.*

13. The text of this regulation appears *supra* note 3.

14. The existence of this regulation makes clear that Bockness is incorrect in his speculation that "one would think that recurrent disability is sufficient in and of itself to justify a departure from the normal frequency of treatment standards."

Contrary to this surmise, the regulation articulates a very clear policy of the situations in which it is appropriate for the Board to authorize treatments exceeding the standards. The Board found that Bockness simply did not meet those standards.

15. 895 P.2d 962 (Alaska 1995).

standard; it merely requires the treating health care provider to meet the procedural prerequisites to receive payment for those treatments."[16] Indeed, this feature of the standards—that they are not an absolute maximum—was a crucial factor in this court's holding that the standards did not violate substantive due process.[17]

Thus, Bockness might have a sustainable claim of reversible error if the Board had treated the standards as an inflexible upper limit of the treatment Bockness could receive. But nothing in the Board's decision supports Bockness's claim that it viewed the frequency limits as absolute maximums. Indeed, the Board declined to require Brown Jug to fund treatments above the statutory standards. But the Board based its decision on its finding that, while Dr. Morgan submitted a treatment plan pursuant to 8 AAC 45.082(g), he failed to comply with that plan and exceeded the limits set out in it. Moreover, the Board accepted the medical evidence presented by Drs. Horning, Hadley, and the IME panel that "chiropractic treatments, of such a passive nature, were not necessary for such a long and extensive duration." In short, the Board did not authorize treatments above the frequency limits because Bockness's case did not satisfy the prerequisites of 8 AAC 45.082(g)(3)—the Board, exercising its discretion, found that "the employee has failed to prove his claim by a preponderance of the evidence that the board's frequency standards are unreasonable considering the nature of the employee's injury."[18]

This finding by the Board—that no special circumstances justified chiropractic treatment above the frequency limits—was supported by substantial evidence. As Bockness notes, Dr. Morgan testified as to his reasons for treating Bockness more frequently than the statutory standards, explaining that Bockness healed more slowly than was typical and suffered numerous exacerbations of his condition. Dr. Morgan also stated his belief that the frequency of treatments he provided to Bockness was medically reasonable and necessary. Bockness testified that Dr. Morgan's care eased his pain somewhat. The Board accepted this testimony as credible.

But the Board also heard the opinions of the IME panel and Drs. Hadley and Horning, all of whom disagreed with Dr. Morgan. As early as December 1993, the IME panel stated that "[w]e do not feel further chiropractic treatment is recommended" because "it probably is not beneficial." Dr. Hadley similarly recommended in March 1994 and again in May 1994 that chiropractic adjustments be discontinued because they were passive treatments that would not "help [Bockness] functionally progress." Dr. Horning concurred, voicing his opinion that the chiropractic adjustments should have been discontinued after four to six weeks when they did not produce significant gains. The Board accepted the medical evidence presented by the IME panel and Drs. Hadley and Horning as convincing. Given that this court "will not disturb the Board's decision to choose to rely on one medical opinion rather than another,"[19] the Board's decision to refuse to authorize additional treatments above the frequency standards was supported by substantial evidence.[20]

**16.** *Id.* at 967.

**17.** *See id.* at 966–68.

**18.** *Cf. Hale v. Anchorage Sch. Dist.*, 922 P.2d 268, 270–71 (Alaska 1996) (employer became liable for treatment in excess of frequency standards only after board found that conforming treatment plan was timely filed and that treatments were likely to improve employee's condition).

**19.** *Brown v. State*, 931 P.2d 421, 425 (Alaska 1997) (citing *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1049 (Alaska 1978)).

**20.** Bockness also reiterates his substantial evidence arguments, reframed as a contention that Brown Jug did not rebut the statutory presumption of compensability in AS 23.30.120. An employer can overcome this presumption by producing rebuttal evidence that, viewed by itself, is substantial evidence that the medical treatment is not compensable. *See Bouse v. Fireman's Fund Ins. Co.*, 932 P.2d 222, 231–22 (Alaska 1997). Here, the same affirmative evidence upon which the Board relied in determining that the care Bockness received was not reasonable or necessary also is sufficient to rebut the presumption of compensability.

Thus, we affirm the Board's refusal to require Brown Jug to pay for Dr. Morgan's treatments to the extent they exceed the treatment frequency standards set out in 8 AAC 45.082(f).

### 2. *The Board appropriately limited Dr. Ferris's treatment of Bockness.*

Bockness also challenges the Board's finding that the epidural and trigger point injections provided by Dr. Ferris, along with some referrals made by Dr. Ferris, were not reasonable or necessary. We reject these claims as well.

■ Bockness first saw Dr. Ferris in May 1994. Dr. Ferris diagnosed him with myofacial pain with trigger points and a sleep disturbance. Dr. Ferris began administering a regimen of physical therapy together with trigger point and epidural injections and medications. Ultimately, Bockness had three trigger point injections and three epidural injections over a two-month period.[21] Dr. Ferris testified that his treatment of Bockness was reasonable and necessary and that he followed accepted protocols in administering the injections. While conceding that his treatment methods were controversial, Dr. Ferris maintained that they were medically indicated and helpful to Bockness. The Board found that this testimony established the presumption of compensability and stated: "Dr. Ferris's treatment, although controversial, is recognized by the medical community. Therefore, we find his treatment, if applied properly, to be reasonable and necessary, and therefore compensable."

But the Board also had before it the medical opinion of two other physicians who disagreed with Dr. Ferris's assessment and treatment of Bockness. With reference to trigger point injections, Dr. Horning, citing medical authority, expressed his belief that such injections have not satisfactorily been proven effective. Dr. Horning testified that, while trigger point and epidural injections might be reasonable to try briefly, such injections should not extend beyond a six-week period and that nothing in the medical litera-

ture supported continuing beyond that period without tremendous improvement by the patient. He concluded that only the first two injections received by Bockness were medically indicated. Dr. Hadley also concluded that neither epidural injections, trigger point injections, nor the medications prescribed by Dr. Ferris were medically indicated for Bockness. Both Dr. Horner and Dr. Hadley found that the referral tests recommended by Dr. Ferris were not medically indicated. The Board relied on these two opinions to conclude that only six weeks of Dr. Ferris's treatments, and not his referrals, were compensable. Thus, the Board had substantial evidence to support its finding.

## V. CONCLUSION

Because the Board correctly applied the law to Bockness's claim and because substantial evidence exists to support the Board's decision, we AFFIRM.

---

**21.** These treatments do not fall under the treatment frequency standards in 8 AAC 23.30.095(c). The Board determined that a series of three

injections did not constitute continuing and multiple treatment, and the parties have not challenged this finding.