**STATE of Alaska and Alaska Office of Victims' Rights, Appellants/Cross–Appellees,**

v.

**John M. MURTAGH, James H. McComas, Cynthia Strout, Sidney K. Billingslea, and Harry Dee Taylor, Appellees/Cross–Appellants.**

**Nos. S–11988, S–12007.**

Supreme Court of Alaska.

Oct. 26, 2007.

---

Robert P. Blasco, Robertson, Monagle & Eastaugh, Juneau, for Appellants/Cross–Appellees.

Susan Orlansky, Feldman Orlansky & Sanders, Anchorage, for Appellees/Cross–Appellants.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and BRYNER, Justices.

*OPINION*

MATTHEWS, Justice.

The question in this case is whether certain provisions of the Alaska Victims' Rights Act are unconstitutional. We conclude that they are because they interfere with criminal defense investigations without adequate justification.

## I. PROCEEDINGS

This case was initiated by criminal defense attorneys John Murtagh, James McComas, Cynthia Strout, and Sidney Billingslea and defense investigator Harry Taylor (collectively referred to in this opinion as Murtagh), on behalf of themselves and their present and future clients. They challenged certain provisions of the Victims' Rights Act of 1991.[1]

---

1. The Victims' Rights Act provides in relevant part:

 AS 12.61.120:
 (c) If a defendant or a person acting on behalf of a defendant contacts the victim of an offense with which the defendant is or could be charged, the person shall clearly inform the victim
 (1) of the person's identity and specific association with the defendant;
 (2) that the victim does not have to talk to the person unless the victim wishes; and

 (3) that the victim may have a prosecuting attorney or other person present during an interview.
 (d) If a defendant or a person acting on behalf of a defendant wishes to make a recording of statements of the victim of an offense with which the defendant is or could be charged in this or another jurisdiction, or of a witness, the person shall, before recording begins, obtain the consent of the victim or witness to record the statement by clearly informing the victim or witness (1) of the information set out in (c) of this section, (2) that the state-

In general, the provisions of the act under review regulate criminal defense representatives' conduct with respect to pretrial interviews of victims and witnesses. The act subjects interviews in cases in which the accusation is a sexual offense to constraints that are more strict than those applicable to other offenses. In all cases, before defense representatives may interview a victim, they must state their identity and their association with the defendant,[2] tell the victim that the victim need not talk with the representative,[3] and tell the victim that the victim may have a prosecuting attorney present during the interview.[4] Before a defense representative may electronically record an interview with a victim or witness, the representative must make the statements described above and also state that the interview will be electronically recorded.[5] Murtagh challenged these requirements except the requirement that representatives reveal their identity and association with the defendant.

With respect to interviews in cases involving sexual offenses, Murtagh challenged the additional constraints imposed by the act.

The relevant portions of the challenged provisions:

- Bar defense representatives from contacting a victim or a witness who has informed the defendant or defendant's counsel in writing that the victim or witness does not wish to be contacted by defense representatives.[6]

- Require defense representatives to obtain *written* authorization from a victim or witness before an interview may be recorded. The authorization must state that the victim or witness is aware that there is no legal requirement that he or she talk to the defense representative and that he or she may have a prosecution representative present during the interview.[7]

- Require defense representatives to obtain *written* authorization from a victim or witness before "obtain[ing] a statement ... not taken as a recording." The authorization must state that the victim or witness is aware that there is no legal requirement that the victim or

ment will be recorded if the victim or witness consents, and (3) that the victim or witness may obtain a transcript or other copy of the recorded statement upon request. When recording begins, the person making the recording shall indicate in the recording that the victim or witness has been informed as required by this subsection, and the victim or witness shall state in the recording that consent of the victim or witness to the recording has been given.
AS 12.61.125:
(a) The defendant accused of a sexual offense, the defendant's counsel, or an investigator or other person acting on behalf of the defendant, may not
(1) notwithstanding AS 12.61.120, contact the victim of the offense or a witness to the offense if the victim or witness, or the parent or guardian of the victim or witness if the victim or witness is a minor, has informed the defendant or the defendant's counsel in writing or in person that the victim or witness does not wish to be contacted by the defense; a victim or witness who has not informed the defendant or the defendant's counsel in writing or in person that the victim does not wish to be contacted by the defense is entitled to rights as provided in AS 12.61.120;
(2) obtain a statement from the victim of the offense or a witness to the offense, unless,
(A) if the statement is taken as a recording, the recording is taken in compliance with AS

12.61.120, and written authorization is first obtained from the victim or witness, or from the parent or guardian of the victim or witness if the victim or witness is a minor; the written authorization must state that the victim or witness is aware that there is no legal requirement that the victim or witness talk to the defense; or
(B) if the statement is not taken as a recording, written authorization is first obtained from the victim or witness, or from the parent or guardian of the victim or witness if the victim or witness is a minor; the written authorization must state that the victim or witness is aware that there is no legal requirement that the victim or witness talk to the defense; a victim or witness making a statement under this subparagraph remains entitled to rights as provided in AS 12.61.120.

2. AS 12.61.120(c)(1).

3. AS 12.61.120(c)(2).

4. AS 12.61.120(c)(3).

5. AS 12.61.120(d).

6. AS 12.61.125(a)(1).

7. AS 12.61.125(a)(2)(A).

witness talk to the defense representative.[8]

If an attorney or a person subject to an attorney's control violates the statutory constraints relating to interviews of victims and witnesses in sexual offense cases, a court upon learning of the violation must refer the incident to the Disciplinary Board of the Alaska Bar Association as a grievance.[9] Statements taken in violation of the statute are presumed inadmissible.[10] The presumption may be overcome if the defendant proves by clear and convincing evidence that (1) the statement is reliable; (2) similar evidence is unavailable from other sources; and (3) failure to admit the statement "would substantially undermine the reliability of the fact-finding process and result in manifest injustice." [11]

After motion practice and discovery a trial was held before Superior Court Judge Sen K. Tan. At the conclusion of the trial, the court entered extensive findings of fact and conclusions of law. Briefly, the court

- Upheld the requirement that defense representatives must tell victims in all cases that they need not talk with the defense representative and may choose to have a prosecuting attorney or other person present during an interview. AS 12.61.120(c)(2) and (3).
- Upheld the bar on defense representatives contacting either victims or witnesses in sexual offense cases where the victims or witnesses have stated in writing that they do not wish to speak with defense representatives. AS 12.61.125(a)(1).
- Struck down the requirement pertaining to sexual offense charges that all victims and witnesses must consent in writing before being interviewed. AS 12.61.125(a)(2)(B).
- Struck down the requirement that a defense representative must obtain the consent of a victim or witness prior to recording an interview. AS 12.61.120(d) and AS 12.61.125(a)(2)(A).

As to those provisions that the superior court found unconstitutional the court's rationale was, in each case, that the provision violated the equal protection and due process clauses of the Alaska Constitution. The court found that neither party was the prevailing party for purposes of an award of attorney's fees and determined that no award of attorney's fees was appropriate. A final judgment was entered in accordance with these conclusions.

The State has appealed from those portions of the judgment that struck down the consent in writing requirements of AS 12.61.125(a)(2)(B) and the bar on undisclosed electronic recording contained in AS 12.61.120(d) and AS 12.61.125(a)(2)(A). Murtagh has taken a cross-appeal from most, but not all, of the portions of the judgment that rejected his contentions. He argues that the advice requirements contained in AS 12.61.120(c)(2) and (3) are unconstitutional except as applied to victims of sexual offenses and domestic violence. He also argues that the no-contact provisions contained in AS 12.61.125(a)(1) should be struck down with respect to witnesses but not victims. In addition, Murtagh argues that the court erred in declining to hold that he was the prevailing party in the litigation.

## II. STANDARD OF REVIEW

We review the constitutionality of a statute, like all legal questions, de novo, and will "adopt the rule of law which is most persuasive in light of precedent, reason, and policy." [12] We apply the clearly erroneous standard of review to a trial court's findings of fact.[13] A finding of fact is clearly erroneous and will be reversed only if review of the entire record leaves us with a definite and firm conviction that a mistake has been made.[14]

---

**8.** AS 12.61.125(a)(2)(B).

**9.** AS 12.61.125(c).

**10.** AS 12.61.127.

**11.** *Id.*

**12.** *Alaska Inter–Tribal Council v. State,* 110 P.3d 947, 955–56 (Alaska 2005).

**13.** *Id.*

**14.** *Id.*

## III. DISCUSSION

### A. Equal Protection

■ One of the State's primary contentions is that the equal protection clause of the Alaska Constitution does not apply to this case.[15] The State argues that the State itself is not a "person" within the meaning of this clause. A statute that denies "persons" rights available to the State may therefore not be invalidated on equal protection grounds.

This argument is supported by our case law. We stated in *Weidner v. State, Department of Transportation & Public Facilities*: "Equal protection ensures that the State will not treat an individual or group of individuals differently from all other individuals. Equal protection does not, however, require the State to treat all individuals the same as it treats itself."[16] Given *Weidner* and the absence of any persuasive contrary authority from other jurisdictions, we agree that the Victims' Rights Act is not vulnerable to a constitutional attack under the equal protection clause.

### B. Due Process

■ The superior court relied alternatively on the due process clause of the Alaska Constitution.[17] The court concluded that "[t]he guarantee of due process protects a criminal defendant's right to prepare and present a defense," and observed that "[h]aving reasonable access to witnesses is an essential part" of this right. The superior court pointed out that opinions of this court and the Alaska Court of Appeals have

condemned on due process grounds actions by the state that interfere with the right to present witnesses to support a defense.[12]

---

12. *See Brandon v. Dep't of Corrections*, 865 P.2d 87, 90 (Alaska 1993) (holding that, because "[t]he right to call witnesses and present evidence is fundamental to a fair hearing and due process," even in prison disciplinary hearings the state may not deny an inmate the opportunity to present a witness except for compelling reasons); *Boggess v. State*, 783 P.2d 1173, 1179 (Alaska App.1989) ("A defendant's right to offer the testimony of witnesses is protected by the due process clause of the fourteenth amendment.... The prosecution violates this important right when it engages in conduct or makes comments aimed at discouraging defense witnesses from testifying freely.").

The court also stated:

A person charged with a crime has a right to investigate the charges against him or her. This right is protected by the rights to compulsory process, due process, and effective assistance of counsel. Alaska Const. art. I, § 11 and art. I, § 7.

In Alaska, the right to compulsory process includes the right to obtain witnesses and documentary evidence in the defendant's favor. *Braham v. State*, 571 P.2d 631 (Alaska 1977), *cert. denied*, 436 U.S. 910[, 98 S.Ct. 2246, 56 L.Ed.2d 410] (1978). This includes the right to call witnesses at trial and to have the prosecution disclose

---

15. The equal protection clause, contained in article I, section 1 of the Alaska Constitution, provides: "This constitution is dedicated to the principles ... that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State."

16. 860 P.2d 1205, 1211 (Alaska 1993). Murtagh also argues that equal protection requires that criminal defense attorneys and investigators be treated the same as their civil law counterparts. But this argument lacks merit because criminal defense attorneys and investigators are only disadvantaged relative to state prosecutors and police. When they are engaged in civil litigation they have all the rights of civil litigators. Fur-

ther, civil and criminal litigants are not similarly situated groups for equal protection purposes given the many differences between civil and criminal litigation. The two types of litigation have different aims and possible outcomes, and the rights and obligations of litigants also differ. *See Alaska Inter–Tribal Council*, 110 P.3d at 967: "If it is clear that two classes are not similarly situated, this conclusion 'necessarily implies that the different legal treatment of the two classes is justified by the differences between the two classes.'"

17. Article I, section 7 of the Alaska Constitution provides in part: "No person shall be deprived of life, liberty, or property, without due process of law."

evidence in its possession to the defendant. The right to compulsory process includes the right to investigate witnesses who are necessary to the defense before trial. However, the right to interview a witness does not mean there is the right to a successful interview. Rather, the right involves the unfettered opportunity to interview witnesses.

Similarly, the right to due process in a criminal proceeding may require the police to preserve evidence, but also provides the right to challenge the evidence the prosecution intends to rely on at trial. *Gundersen v. Municipality,* 762 P.2d 104 (Alaska App.1988), *aff'd,* 792 P.2d 673 (Alaska 1990). Some federal circuits and other states have concluded that due process affords a criminal defendant the right to interview witnesses. *Kines v. Butterworth,* 669 F.2d 6, 9 (1st Cir.1981); *Upham v. Bonebrake,* [303 Or. 361,] 736 P.2d 1020, 1022 (Or.1987). The cases also hold that criminal defendants have a right to access witnesses and the prosecution may not, without justification, interfere with that right. *Bonebrake,* 736 P.2d at 1022–23. Some jurisdictions view the right to investigate to include a face-to-face interview, unless there are questions of safety and well being of the witness. *State v. Boiardo,* [172 N.J.Super. 528,] 412 A.2d 1084, 1086 (N.J.1980).

The fundamental right to effective assistance of counsel requires defense counsel to conduct a prompt and thorough investigation, or to make a reasonable decision that a particular investigation is not necessary.[3] Other courts have found the right to investigate collateral to the right to counsel.

Therefore under the panoply of a criminal defendant's fundamental pre-trial rights, those rights are only meaningful if an accused has the right to investigate. The right to investigate includes the opportunity to interview victims and witnesses without interference by the prosecution.

---

[3] *See* ABA STANDARDS FOR CRIMINAL JUSTICE: THE PROSECUTION FUNCTION AND DEFENSE FUNCTION, Standard 4–4.1(a) & commentary at 181–83 (3d ed.1993); *State v. Jones,* 759 P.2d 558, 569 (Alaska App. 1988); *Arnold v. State,* 685 P.2d 1261, 1265–67 (Alaska App.1984).

We agree with the superior court, based on the authorities the court cited and others referred to below, that due process—considered here as encompassing other more specific fair trial rights such as the right to effective assistance of counsel and the right to compulsory process—guarantees to persons accused of crime the right to prepare and present a defense. This right includes the right to reasonable access to witnesses without unjustified state interference.

## C. Review of Due Process Fair Trial Claims

■ The State misunderstands the concept of due process with respect to defense investigative rights. It contends that our substantive due process jurisprudence applies and that a statute may be struck down as violating due process only when it "has no reasonable relationship to a legitimate governmental purpose."[18] The State argues that since all of the provisions of the act have some relationship to a proper objective, the superior court's decision holding certain provisions unconstitutional must be reversed. But the State has confused substantive due process claims with claims that due process guarantees of a fair trial have been violated. State practices, including statutes, that interfere with fair trial rights do not pass constitutional muster merely because they are minimally rational.[19]

---

18. *Chiropractors for Justice v. State,* 895 P.2d 962, 966 (Alaska 1995).

19. *Cf., e.g., Brooks v. Tennessee,* 406 U.S. 605, 611, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972) (holding that Tennessee statute requiring defendant to testify before any other testimony for the defense if he wished to testify at all violates right of due process under the Fourteenth Amendment by limiting counsel's ability to evaluate the need for such testimony, even though statute is based on legitimate interest in preventing testimonial influence).

■ The subject of criminal procedure, which in a broad sense includes pretrial discovery and investigative practices as well as the conduct of court proceedings, is one in which this court has special responsibilities. The rights of those accused of crime are largely constitutionally based. These rights include, as Judge Tan noted, not only the due process guarantee,[20] but also numerous specific rights that are necessary to ensure a fair trial. These include the right not to be placed in jeopardy twice for the same offense,[21] the privilege against self-incrimination,[22] the right to a speedy and public trial,[23] the right to trial by jury,[24] the right of the accused to be informed of the charges against him,[25] the right to bail,[26] the right of confrontation,[27] the right to have compulsory process for obtaining witnesses,[28] and the right to effective assistance of counsel.[29] It is the obligation of the courts to interpret these provisions so that they may be applied in particular cases and to ensure that the rights they provide are not infringed by any form of state action. "Under Alaska's constitutional structure of government, 'the judicial branch . . . has the constitutionally mandated duty to ensure compliance with the provisions of the Alaska Constitution, including compliance by the legislature.' "[30]

■ In addition, the Alaska Constitution vests in this court the power to "make and promulgate rules governing practice and procedure in civil and criminal cases."[31] We have exercised this authority to regulate pretrial discovery in criminal cases. In particular, a rule promulgated by this court prohibits both prosecution and defense representatives from advising witnesses to refrain from discussing a case with opposing representatives or "otherwise imped[ing] opposing counsel's investigation of the case."[32] In addition, this court has inherent authority to regulate the conduct of attorneys, including the authority to define ethical norms and provide for attorney discipline.[33]

■ This discussion of the court's responsibility concerning fair trial rights does not mean that the legislature is powerless to act in the area. But our responsibility requires that statutes that are claimed to infringe fair trial rights be closely scrutinized. Unlike in equal protection cases, we have not formulated a detailed method of analysis by which such claims may be judged.[34] Nor do we do so comprehensively in this case. Here it is sufficient to hold that statutes that trench on fair trial rights must, at a minimum, have as their purpose the protection of important interests. We must ask in each case whether the interests served by a statute are of sufficient weight to justify the limitations imposed on fair trial rights.[35] In

20. Alaska Const. art. I, § 7.

21. Alaska Const. art. I, § 9.

22. Alaska Const. art. I, § 9.

23. Alaska Const. art. I, § 11.

24. *Id.*

25. *Id.*

26. *Id.*

27. *Id.*

28. *Id.*

29. *Id.*

30. *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.,* 28 P.3d 904, 913 (Alaska 2001) (alteration in original) (quoting *Malone v. Meekins,* 650 P.2d 351, 356 (Alaska 1982)).

31. Alaska Const. art IV, § 15.

32. Alaska R.Crim. P. 16(d).

33. *In re Simpson,* 645 P.2d 1223, 1226 (Alaska 1982); *In re MacKay,* 416 P.2d 823, 836–37 (Alaska 1964) (holding that court has inherent power over the suspension and disbarment of attorneys that "cannot be defeated by the legislative branch of government").

34. An explanation of our equal protection method of analysis may be found in *Gonzales v. Safeway Stores, Inc.,* 882 P.2d 389, 396 & n. 7 (Alaska 1994).

35. *Cf. Rock v. Arkansas,* 483 U.S. 44, 55–56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) ("Of course, the right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' But restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve. In applying its evidentiary rules

striking this balance we will consider not only the relative strength of the purpose underlying the statute but also the likelihood that the statute will achieve its purpose and whether the purpose can be achieved in another way that does not impede fair trial rights.

With these observations in mind, we proceed to examine the provisions of the Victims' Rights Act at issue in this case. The provisions can be discussed in three categories. These categories encompass provisions that

(1) require defense representatives to give unsolicited advice to victims and witnesses about their rights and in the case of sexual offenses to obtain written consent to any interview; [36]

(2) enforce "no-contact" statements of witnesses; [37] and

(3) bar undisclosed electronic recording.[38]

### D. Provisions Requiring Defense Representatives To Give Unsolicited Advice and Obtain Written Consent

#### 1. Suggesting that witnesses not cooperate with defense representatives is improper.

As noted, Criminal Rule 16(d)(1) prohibits both the prosecution and the defense from advising witnesses "to refrain from discussing the case with opposing counsel" and likewise prohibits "otherwise imped[ing] opposing counsel's investigation of the case." These prohibitions have both an ethical and a constitutional foundation.

The American Bar Association Standards for Criminal Justice provide that "[a] prosecutor should not discourage or obstruct communication between prospective witnesses and defense counsel. A prosecutor should not advise any person or cause any person to be advised to decline to give to the defense

information which such person has the right to give." [39] The commentary to this standard provides in part:

*Obstructing Communications Between Witnesses and the Defense*

Prospective witnesses should not be treated as partisans. They should be regarded as impartial and as relating the facts as they see them. Because witnesses do not "belong" to either party, it is improper for a prosecutor, defense counsel, or anyone acting for either side to suggest to a witness that the witness not submit to an interview by opposing counsel.

It is not only proper but it may be the duty of the prosecutor and defense counsel to interview any person who may be called as a witness in the case (except that the prosecutor is not entitled to interview a defendant represented by counsel who declines such an interview). In the event a witness asks the prosecutor or defense counsel, or a member of their staffs, whether it is proper to submit to an interview by opposing counsel or whether it is obligatory, the witness should be informed that there is no legal obligation to submit to an interview. It is proper, however, and may be the duty of both counsel in most cases to interview all persons who may be witnesses and it is in the interest of justice that witnesses be available for interview by counsel.

It is proper for a prosecutor to tell a witness that he or she may contact the prosecutor prior to talking to defense counsel. The prosecutor may also properly request an opportunity to be present at defense counsel's interview of a witness, but may not make his or her presence a condition of holding the interview. It is also proper to caution a witness concerning the need to exercise care in subscribing to a statement prepared by another person. In the event that a written statement is

a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify.") (citation and footnote omitted).

**36.** AS 12.61.120(c)(2), (3); AS 12.61.125(a)(2)(B).

**37.** AS 12.61.125(a)(1).

**38.** AS 12.61.120(d); AS 12.61.125(a)(2)(A).

**39.** Standards for Criminal Justice 3–3.1(d) (1993). A similar standard also applies to defense counsel. *Id.* at 4–4.3(d).

signed or otherwise acknowledged by the witness as a correct representation of facts known to the witness, a copy of the statement should be furnished to the witness upon request. [40]

Numerous cases hold that a prosecutor may not suggest, directly or indirectly, that witnesses not speak with defense representatives.[41] A good example is State v. Hofstetter.[42] In Hofstetter the prosecutor made plea agreements with co-conspirators requiring their cooperation in a prosecution against the defendant.[43] When the defendant's counsel attempted to interview the co-conspirators, the prosecutor took the position that if they consented to such interviews without a prosecutor present they would breach the cooperation clause and their plea agreements would be invalidated.[44] The defendant argued that this interfered with his ability to interview witnesses and violated his due process right to a fair trial.[45] The Washington Court of Appeals held that the prosecution's attempt to limit the defendant's right to interview the co-conspirators was prosecutorial misconduct.[46] In so concluding, the Hofstetter court relied both on the ABA Standards and on an extensive survey of cases that prohibit prosecutors from interfering with defense interviews.[47]

One of the leading cases relied on by Hofstetter is Gregory v. United States.[48] In Gregory the prosecutor advised witnesses not to speak with defense representatives unless he was present.[49] The court concluded that this advice denied the defendant a fair trial because it was "a suppression of the means by which the defense could obtain evidence":

Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them. Here the defendant was denied that opportunity which, not only the statute, but elemental fairness and due process required that he have. It is true that the prosecutor stated he did not instruct the witnesses not to talk to defense counsel. He did admit that he advised the witnesses not to talk to anyone unless he, the prosecutor, were present.

We accept the prosecutor's statement as to his advice to the witnesses as true. But we know of nothing in the law which gives the prosecutor the right to interfere with the preparation of the defense by effectively denying defense counsel access to the witnesses except in his presence. Presumably the prosecutor, in interviewing the witnesses, was unencumbered by the presence of defense counsel, and there seems to be no reason why defense counsel should not have an equal opportunity to determine, through interviews with the witnesses, what they know about the case and what they will testify to . . . .

. . . .

A criminal trial, like its civil counterpart, is a quest for truth. That quest will more often be successful if both sides have an equal opportunity to interview the persons who have the information from which the truth may be determined. The current tendency in the criminal law is in the direction of discovery of the facts before trial and elimination of surprise at trial. A

40. Id. at 3–3.1 (footnote omitted). Similar commentary is set out with respect to the defense function. Id. at 4–4.3.

41. The same holds true for defense counsel, as witnesses have a legal right to decline to be interviewed by prosecutors and police as well as by defense counsel. See, e.g., Commonwealth v. St. Pierre, 377 Mass. 650, 387 N.E.2d 1135, 1140 (1979) (holding that witnesses in criminal cases may decline interviews from either side); State v. Singleton, 853 S.W.2d 490, 493 (Tenn.1993) (holding that witnesses have discretion whether to talk to either side); 23A C.J.S. Criminal Law § 1627 (2007) ("[W]itnesses may decline of their own will to talk to either side . . . .").

42. 75 Wash.App. 390, 878 P.2d 474 (1994).

43. Id. at 475–76.

44. Id. at 476.

45. Id.

46. Id. at 481–82.

47. Id. at 478–81.

48. 369 F.2d 185 (D.C.Cir.1966).

49. Id. at 187.

related development in the criminal law is the requirement that the prosecution not frustrate the defense in the preparation of its case. Information favorable to the defense must be made available to the defense. Reversals of convictions for suppression of such evidence, and even for mere failure to disclose, have become commonplace. It is not suggested here that there was any direct suppression of evidence. But there was unquestionably a suppression of the means by which the defense could obtain evidence. The defense could not know what the eye witnesses to the events in suit were to testify to or how firm they were in their testimony unless defense counsel was provided a fair opportunity for interview. In our judgment the prosecutor's advice to these eye witnesses frustrated that effort and denied appellant a fair trial. [50]

The ABA Commentary recognizes that instances of prohibited interference with a defense investigation can be both direct and indirect. Thus, the Commentary to Standard for Criminal Justice 11–4.1 recognizes that "[o]bstruction or interference with opposing counsel's investigation and preparation of the case frequently takes the form of instructing witnesses not to talk with opposing counsel or their staffs, but it may take the form of more subtle instructions." [51]

### 2. The advice and written consent provisions impliedly suggest non-cooperation.

We believe that requiring defense representatives to give unsolicited advice to victims and witnesses that they are not required to talk to the representative and may have a prosecutor present if they do conveys an implied suggestion to prospective interviewees that it would be best if no interview were given. This none-too-subtle warning, in turn, substantially interferes with defense efforts to obtain evidence. The added requirement in sexual offense prosecutions of written consent to an interview serves to strengthen the message of noncooperation. The testimony presented at trial and the court's findings tend to confirm these observations.

At trial numerous witnesses testified that the advice requirements resulted in a significant reduction in the number of people willing to give interviews. One attorney estimated, as the court summarized her testimony, "that 90% of the people she contacts in civil and criminal cases talked with her when she gave no warning, but only about 50% are willing to talk after they receive the statutorily mandated warnings." A defense investigator who was formerly a police investigator testified, again as summarized by the court, "that the statutes severely impede his investigations, because of the warning." Other witnesses also testified to reduced success in obtaining interviews. Witnesses also stated that the mandated advice makes people uncomfortable and suspicious. As a result, as the court observed, "even if the interview is not thwarted by the warnings, the quality and quantity of information obtained through the interview declines." An expert witness presented by the State stated that the act has "resulted in a declining number of witnesses being willing to talk with defense investigators." The court found that police and prosecutors agreed that "if the police had to provide the same warning, this would have a negative impact on the prosecution's ability to investigate." The court found that the requirement of written consent in AS 12.61.125(a)(2) posed additional problems. The writing requirement has especially adverse consequences in remote locations because of logistical difficulties. In a state where many interviews must be conducted by telephone, the need for a signed written consent to an interview works as a practical roadblock. We set out the court's findings on this point in the margin.[52]

---

50. *Id.* at 188–89 (citations and footnotes omitted).

51. STANDARDS FOR CRIMINAL JUSTICE 11–4.1 cmt. (1980) (footnote omitted).

52. The court found:

49. The requirement to obtain written consent to an interview in a sexual offense case, where the interview is not taped, makes it more difficult to obtain interviews.

50. The requirement makes it very difficult to do phone interviews, because of the logis-

The effect of the unsolicited advice and written consent requirements as detailed above is disturbing. We accept as given that "it is in the interest of justice that the witnesses be available for interview by counsel"[53] and that justice is more likely to be achieved "if both sides have an equal opportunity to interview the persons who have the information from which the truth may be determined."[54] Yet it appears that the requirements are substantially interfering with these objectives.

### 3. Purposes of the provisions

The first section of the Victims' Rights Act states its purpose:

The purpose of AS 12.61.100–12.61.150 is to protect victims of and witnesses to crime from risk of harassment, intimidation, and unwarranted invasion of privacy by prohibiting the unnecessary disclosure of their addresses and telephone numbers.[55]

In 1994 the Alaska Constitution was amended by adding a victims' rights clause. Article I, section 24 provides:

Crime victims, as defined by law, shall have the following rights as provided by law: the right to be reasonably protected from the accused through the imposition of appropriate bail or conditions of release by the court; the right to confer with the prosecution; the right to be treated with dignity, respect, and fairness during all phases of the criminal and juvenile justice process; the right to timely disposition of the case following the arrest of the accused; the right to obtain information about and be allowed to be present at all criminal or juvenile proceedings where the accused has the right to be present; the right to be allowed to be heard, upon request, at sentencing, before or after con-

---

tical difficulty of getting a written consent before proceeding with the interview. Witnesses sometimes call defense investigators. In order to continue the interview and to comply with the statute, the attorney needs to stop the interview and direct the witness to the nearest Kinko's (or other such place) to receive and return a fax, or else make arrangements to meet the witness in person.

51. The requirement to obtain written consent is a problem when a witness is willing to agree to a telephonic interview but not willing to meet the investigator in person, as there is inevitably a delay.

52. The requirement to obtain written consent to an interview negates the possibility of an impulsive interview—taking advantage of bumping into someone—unless the investigator or attorney always carries consent forms.

53. This requirement presents particular difficulties for investigating in rural Alaska, because so much investigating must be done by telephone and it is very difficult to get written consent in those circumstances. Grace Cross described how she is responsible for investigations in 32 villages; it is very expensive to travel, and weather can be a major factor in her ability to go somewhere. Thus, she must do most of her investigating by telephone. She finds that a lot of people are willing to talk to her, but not willing to be taped, and in those situations she must obtain written consents.

54. There are few fax machines in the villages. Even a witness willing to talk on the phone may be unwilling to take the time to go somewhere, fill out a form, and fax it back. Communications across phone lines in rural Alaska are not always easy. For example, there are only three telephone lines to Little

Diomede. Many people do not have their own phone, and they have to go to a public phone or to a neighbor's house, and people don't like to do that because they don't want to attract attention.

55. If Ms. Cross is able to reach a person by phone, she can read the required warnings and have the person agree to them orally, but then she must arrange for the person to receive, sign, and fax back the written consent form. She tries to call the city office, IRA office, or school to arrange for the person to receive a fax there, but many times people don't want to go to a public place. Most of the time the police department is housed in the city office. Often there is a cost associated with receiving and sending a long distance fax (typically $1.00). Further, the person needs to write his or her name and the name of the person who sent or received the fax on a list that is left in the public office. For these reasons, it is rare for a person to agree to go to a public place (often the police department), wait for a fax, pay $1–2, then go home to await a call back from the defense investigator.

56. Ms. Cross finds that she must travel more now in order to obtain written consents in face-to-face interviews. There are many hardships associated with travel in bush Alaska.

**53.** Standards for Criminal Justice 4–4.3 cmt. (1993).

**54.** *Gregory,* 369 F.2d at 188.

**55.** AS 12.61.100.

viction or juvenile adjudication, and at any proceeding where the accused's release from custody is considered; the right to restitution from the accused; and the right to be informed, upon request, of the accused's escape or release from custody before or after conviction or juvenile adjudication.

According to the State, the 1996 amendments to the Victims' Rights Act were meant to implement the new constitutional clause. The amendments added AS 12.61.120(d)—prohibiting undisclosed recording of victim and witness interviews—and AS 12.61.125—adding more stringent constraints in connection with recorded and unrecorded interviews of victims and witnesses in sexual offense cases.[56] The legislative history of the 1996 amendments indicates that they were meant to reduce the sense of continued violation that victims may experience when they participate in pretrial and trial processes.[57]

With respect to the advice and written consent requirements that are the subject of this part of the opinion, the State contends that the requirements are designed to ensure that citizens are provided advice when they most need it—"when they are being approached by the defense for an interview"—so that they can "meaningfully exercise their rights and exercise some control over their life." The State summarizes the statutory purposes as follows:

> By requiring defense representatives to advise victims and witnesses they do not

have to be interviewed and that they can have another person present, and to obtain their permission before tape recording them, the Legislature attempted to assure that victims are treated with dignity, respect and fairness, as required by Article I, sec. 24 of the Alaska Constitution, and to minimize instances of intimidation and harassment, and violations of the privacy guaranteed by Article I, sec. 22 of the Constitution.

**4. The purposes of the provisions do not justify the impediments they impose.**

The validity of the oral advice requirements of subsections .120(c)(2) and (3) as applied to sexual offense and domestic violence victims are not in question in this case. As to victims in those categories only the written consent requirement of subsection .125(a)(2)(B) is challenged. The superior court found, as described above, that the written consent requirement posed serious practical problems, especially in non-urban areas. The court concluded that the written consent requirement added little if anything to the understanding of a victim's rights that is obtained by compliance with the oral advice requirements.[58] As to witnesses in sexual offense cases, the court observed that the written requirement was overbroad since it applied to all witnesses, many of whom are not emotionally vulnerable.[59]

**56.** Ch. 64, §§ 17–20, SLA 1996.

**57.** Hearing on H.B. 314 before the H. Comm. on the Judiciary, 19th Leg. 79–80 (Alaska 1996) (Statement of Rep. Con Bunde, Member, House Comm. on the Judiciary).

**58.** The court stated:

> AS 12.61.125(a)(2)(B) requires, in sex offense cases, for victims and witnesses to consent to be interviewed in writing. This court has already ruled that with respect to victims, requiring consent is constitutional. The narrow question as it applies to victims of sexual offenses is whether the additional requirement that the consent be in writing is constitutional. Some evidence suggests some victims may not understand they do not have to speak with defense investigators. This court has recognized that some victims of sexual assault may be particularly vulnerable, but the evidence

does not show that verbal consent as opposed to written consent improves understanding of a person giving or denying consent, or protects the privacy interest. Further, this court is concerned about the disparate impact this requirement may have on conducting interviews in the bush. Indeed, given the evidence, it would probably enhance the privacy of a victim to speak on the phone, with oral consent, rather than have a document faxed to a public place for a signature.

**59.** The court stated:

> This provision also requires written consent from witnesses in a sex offense case. The restrictions apply to *all* witnesses, including police officers, lab technicians, friends of the defendant, and people who may have had some contact with the victim or defendant before or after the crime. As with any crime, there may be witnesses who have an emotional

■ The stated objectives of the Victims' Rights Act are unquestionably legitimate. But the written advice and consent provisions go well beyond what is reasonably needed to achieve them. Victims of sexual offenses can be advised of their rights in a neutral fashion by prosecution representatives or victims' rights advocates, and the advice may be repeated orally by defense representatives. Requiring the additional step of written consent in the context of a defense interview only serves to underline a message that cooperation with the defense is undesirable. As to witnesses, the written consent requirement conveys the same message of noncooperation with even less justification.

■■ Turning to the advice requirements in general, their unbalanced nature is noteworthy. Witnesses and victims have the same right to decline to be interviewed by police and prosecutors as by defense representatives. Likewise witnesses and victims have the right to give such interviews only in the presence of defense representatives or other persons. But the provisions under review do not require that these rights be communicated. It is reasonable to assume that with respect to some victims, only defense representatives seem threatening and thus only one-sided advice needs to be given. But it is also true that some victims and witnesses feel harassed by the demands made on them by law enforcement personnel.[60] The fact that only defense representatives must tell a victim or witness "you don't have to talk to me" strengthens the suggestion that noncooperation with the defense side is desirable. The one-sidedness of the requirements also suggests a design to give an unfair advantage to the prosecution and undercuts the argument that they are only meant to convey to prospective interviewees accurate information about their legal rights.[61]

We do not suggest that victims and witnesses should not be advised of their legal rights. But the form of advice given, bearing as it does the endorsement of the State, must be accurate, balanced, and designed to avoid conveying any suggestion that it is desirable not to cooperate with defense representatives. We think this could be accomplished if law enforcement personnel or victims' advocates were to present a carefully thought-out statement to victims and witnesses at the outset of proceedings.

The advice and written consent provisions in their present form interfere with defendants' investigations. Adhering to them necessarily carries a message that it is undesirable to cooperate with defense representatives. Further, the written consent requirement imposes needless practical obstacles and is overbroad. The neutral objective of informing victims and witnesses of their rights and achieving the benefits that flow from such information can be realized without these impediments. For these reasons we conclude that the provisions are inconsistent with the due process rights of those accused of crime.

involvement in the case or who are especially vulnerable. The evidence in the record does not establish a basis for restricting defense interviews with all witnesses in sexual offense cases, absent written consent. The provision is overbroad....

60. The superior court made the following findings on this subject:

73. Victim advocates are concerned about the way that police treat victims, as well as about the way defense representatives treat victims. Victims sometimes are confused about whether they have to talk to the police or the prosecutor, and some complain about the way they are treated by the police and prosecutors.

74. One victim advocate witness[ ] opined that it would be "very helpful" for victims to know that they have a choice whether to talk with the prosecutor or the police. It would be helpful to victims if *all* the people who deal with a victim would tell her whether she is or is not required to speak to that person.

61. In *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the Court struck down a Texas statute that precluded an accused from calling witnesses who were coparticipants in the crime charged but that permitted them to testify for the state. The underlying justification for the statute was the prevention of perjury. *Id.* at 20–21, 87 S.Ct. 1920. In part because of the one-sidedness of the prohibition, the Court declined to credit this justification. *Id.* at 22, 87 S.Ct. 1920. Similarly in the present case, the one-sidedness of the advice required to be given casts doubt on the offered justification that the objective is simply to give legal advice.

### E. The Provision Enforcing No–Contact Statements of Witnesses

#### 1. The no-contact provision impedes investigations.

Alaska Statute 12.61.125(a)(1) prohibits defense representatives in sexual offense cases from contacting victims or witnesses if the victim or witness has in writing or orally informed defense representatives that he or she does not wish to be contacted by the defense. Murtagh challenges this provision as it relates to writings signed by witnesses but not those signed by victims.[62]

Murtagh notes that the no-contact provision has fostered a practice among prosecuting attorneys whereby they provide witnesses with no-contact forms early in a case.[63] Murtagh argues that it is good investigative practice to recontact witnesses who initially refuse an interview and that sometimes upon being recontacted a witness will give an interview. This practice is foreclosed by the provision. Murtagh argues that "[n]othing justifies treating defense representatives differently from prosecutors, police officers, reporters, and nosy neighbors, all of whom have a right to contact witnesses repeatedly to see if they have changed their minds and have become willing to be interviewed."

At the trial, police investigators confirmed that they frequently recontact witnesses who initially refused to speak. This is regarded as proper investigative technique, not as intimidation or harassment. Defense investigators testified that the use of no-contact forms impeded their investigations. The trial court credited this testimony.[64]

Nonetheless, the trial court upheld the no-contact provision on the ground that it is justified as a means of enforcing a witness's right not to be interviewed. The State argues that this conclusion is self-evidently correct:

Is it substantial governmental interference with the defense access and opportunity to interview a witness to require the defense to honor the witness' invocation of the right not to be interviewed? Asked another way: Is there anything in the constitution that creates a right to contact people when they say no?

In our view the presentation of no-contact forms by prosecution representatives to prospective witnesses is inherently suggestive. The message conveyed is that the presenter believes that the witness would be well served by refusing to speak with defense representatives. This suggestion is strengthened if, as seems likely, the presenter explains that if the no-contact form is signed the law will prohibit defense representatives from contacting the witness. That the no-contact provision has the effect of denying defense representatives access to some witnesses who would otherwise speak to them was, as noted above, established at

---

**62.** The no-contact prohibition as it applies to oral statements is not discussed in any of the briefs.

**63.** A no-contact form in the record provides:

**NOTICE TO DEFENSE REPRESENTATIVES OF REQUEST NOT TO BE CONTACTED**

Re: State v. _____
 Case No. _____
 Alaska Statute 12.61.125
To whom it may concern:
I understand I have a right, as a victim of this crime, to decline any contact from the defendant's lawyer, or an investigator or other person acting on behalf of the defendant. I request that this letter serve as notice that I wish to exercise that right.

_____
(Your Signature)
Date: _____
(Note: If you choose to exercise your right to not be contacted by the defense, fill out this

form, then return it to your contact person in the District Attorney's Office who will send it to the defendant's attorney.)
Although the form in the record applies only to victims, the court found that forms are also commonly provided to witnesses in some districts.

**64.** The court made the following findings on this subject:

60. Without no-contact forms, some ... witnesses in sex offense cases agreed to talk with defense investigators after receiving the warnings in AS 12.61.120(c). Some refused to talk on first request, but agreed if asked a second time.

61. [Defense investigator] Grace Cross often sees the same people again as victims in sexual offense cases. People who were willing to talk with her before 1996 now sometimes sign no-contact forms refusing any contact.

trial. Like the advice provisions, the no-contact provision is one-sided. Witnesses have an equal right to refuse to speak with police and prosecutors, but nothing in the no-contact form recites this right, nor would the no-contact provision enforce it if it were exercised.

■ The use of no-contact forms is a significant step toward making witnesses the "property" of the prosecution in just the sense condemned by the Circuit Court for the District of Columbia in *Gregory v. United States*.[65] "Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them." [66]

### 2. The no-contact provision is not justified.

■ The underlying goals of the no-contact provision are to enforce witnesses' rights not to speak with defense representatives and to prevent the harassment of witnesses and protect their privacy. But the enforcement of rights rationale, taken alone, has a hollow ring because it is only the right to refrain from speaking with defense representatives that is being enforced. The anti-harassment and privacy invasion rationales do not appear to address widespread problems. At trial there was virtually no evidence describing witnesses who believed that they had been harassed by repeated contacts by defense investigators. A number of the State's expert witnesses who testified about persons feeling harassed by defense contacts clarified that their testimony applied solely to victims, not witnesses. Further, there is nothing inherently harassing or invasive about recontacting a witness. As the superior court noted:

> Police and prosecutors do not regard it as harassing, intimidating, reflecting a lack of dignity and respect, or an unjustified invasion of privacy for police to recontact a . . . witness, even one who has expressed a

desire not to speak with the police. Recontacting a reluctant witness can be good police work.

In light of these considerations, it is our view that the impediment to defense investigations posed by the no-contact provision is not justified. If allowed to stand, the provision, especially as implemented, would cordon off many witnesses from defense interviews and thus threaten critical fair trial rights.

### F. The Bar on Undisclosed Electronic Recording

#### 1. Undisclosed electronic recording is lawful and valuable.

■ The undisclosed recording by one party to a conversation is lawful in the state of Alaska. Nationally, the ethics of undisclosed recording by lawyers have been the subject of debate and conflicting rulings. But there is now a consensus that undisclosed recording is not unethical.[67] The American Bar Association issued an opinion in 1974 ruling that a lawyer may not ethically electronically record a conversation without prior knowledge of all parties to the conversation.[68] After much comment and criticism, this opinion was withdrawn, and a new opinion was issued in 2001. The following excerpt from the 2001 opinion explains not only the rationale of the 1974 opinion but also the reasons why it was withdrawn:

> Criticism of Opinion 337 has occurred in three areas. First, the belief that nonconsensual taping of conversations is inherently deceitful, embraced by this Committee in 1974, is not universally accepted today. The overwhelming majority of states permit recording by consent of only one party to the conversation. *Surreptitious recording of conversations is a widespread practice by law enforcement, private investigators and journalists, and the courts universally accept evidence ac-*

---

65. 369 F.2d 185 (D.C.Cir.1966).

66. *Id.* at 188.

67. Although undisclosed recording is not unethical for lawyers, a lawyer may not represent that

an interview is not being recorded when in fact it is. ABA Comm. on Ethics and Prof'l Responsibility, Formal Opin. 01–422 (2001).

68. *Id.*

*quired by such techniques.* Devices for the recording of telephone conversations on one's own phone readily are available and widely are used. Thus, even though recording of a conversation without disclosure may to many people "offend a sense of honor and fair play," it is questionable whether anyone today justifiably relies on an expectation that a conversation is not being recorded by the other party, absent a special relationship with or conduct by that party inducing a belief that the conversation will not be recorded.

*Second, there are circumstances in which requiring disclosure of the recording of a conversation may defeat a legitimate and, even necessary activity.* For that reason, even those authorities that have agreed with the basic proposition of Opinion 337 have tended to recognize numerous exceptions. The State Bar of Arizona, for example, listed four exceptions to the ethical prohibition for such things as documenting criminal utterances (threats, obscene calls, etc.); *documenting conversations with potential witnesses to protect against later perjury; documenting conversations for self-protection of the lawyer;* and recording when "specifically authorized by statute, court rule or court order." *Other ethics committees have excepted recordings by criminal defense lawyers, reasoning that the commonly accepted "law enforcement exception" otherwise would give prosecutors an unfair advantage.* Exceptions also have been recognized for "testers" in investigations of housing discrimination and trademark infringement. And the Ohio Supreme Court, although finding nonconsensual recordings by lawyers generally impermissible, has noted an exception for "extraordinary circumstances" *as well as for investigations by prosecutors and criminal defense lawyers.*

A degree of uncertainty is common in the application of rules of ethics, but an ethical prohibition that is qualified by so many varying exceptions and such frequent disagreement as to the viability of the rule as a basis for professional discipline, is highly troubling. We think the proper approach to the question of legal but nonconsensual recordings by lawyers is not a general prohibition with certain exceptions, but a prohibition of the conduct only where it is accompanied by other circumstances that make it unethical. [69]

The Ethics Committee of the Alaska Bar Association, which had previously adopted the American Bar Association's 1974 opinion, followed the lead of the American Bar Association and in 2003 issued a new ethics opinion reflecting the current views of the American Bar Association.[70]

 The superior court recognized that recording an interview is of considerable value both in preparing and presenting a case. The court also recognized that the right to conduct an undisclosed electronic recording is important because some witnesses refuse to be interviewed if an interview is recorded. We quote here the court's findings with respect to the interests served by the electronic recording of interviews and the effect of requiring a witness to consent in advance to recording.

39. Tape recording interviews is an important investigative tool. A recording captures the exact words and tone of the speaker and [eliminates] any error in interpretation of notes or of memory.

40. Taping also enables the defense investigator to make a record to protect himself or herself against false accusations of misconduct. Again there are no statistics, but false accusations have been made against defense investigators.

41. Defense representatives consider the ability to conduct *secret* taping an important investigative tool, because some victims and witnesses are willing to talk but not willing to talk on tape, or not willing to talk as candidly. Witnesses from the criminal milieu and people connected with the prosecution are especially unlikely to agree to talk on tape. These are the people most likely either to deny what they said or to make a false claim

---

69. *Id.* (emphasis added) (footnotes omitted).

70. Alaska Bar Ass'n, Ethics Opinion No. 2003–1, *Undisclosed Recording of Conversations by Lawyer* (2003).

against the defense investigator. Another category of people unlikely to agree to talk on tape are those whose statements are self-incriminatory.

42. Asking to tape an interview causes some people who had agreed to an interview to change their minds and to refuse to proceed, even after the investigator says she will put the recorder away.

43. Former Commissioner of Public Safety Del Smith concurred with the defense investigators that some people will not talk on tape, and some suffer "mike fright" and find it harder to talk if a recorder is on.

44. Police investigators use tapes secretly and openly. Police officers use secret tape recordings to protect their reputation and to protect themselves against civil liability.

45. Civil investigators also conduct secret tape recordings. Domestic violence victims have made secret tapes of their batterers and have used such tapes in court.

46. In the expert opinion of Joe Austin, the prohibition on secret taping by the defense has a severe impact on the ability to conduct an investigation. [71]

The court in its conclusions of law made the following further observations:

> Taping interviews is a valuable investigative tool. Tapes preserve the exact words and tone of both questions and answers, eliminating any error in recollection or interpretation. The right to engage in *undisclosed* tape recording is an important investigative tool, because some people will agree to be interviewed but will not agree to a tape recorded interview. Asking for permission to tape record results in some witnesses refusing to continue the interview and changes the character of other interviews. Law enforcement officers use secret tape recordings, as do civil investigators.

In our view the court's findings and conclusions concerning the value of electronically recording interviews, including undisclosed recording, are both well considered and correct. They are also consistent with our case law, as we discuss below.

### 2. No substantial countervailing interests are advanced by the bar on undisclosed recording.

The State argues that the bar on undisclosed recording, as applied to victims, is justified by the constitutional guarantee of "the right to be treated with dignity, respect, and fairness during all phases of the criminal ... justice process." [72] As to victims and witnesses, the State argues that undisclosed recording violates privacy rights recognized under article I, section 22 of the Alaska Constitution.[73] The State also argues that the bar is justified by the need to protect victims and witnesses from harassment and intimidation.

The superior court in its conclusions of law discussed these interests and concluded that only subjective dignity interests are compromised by undisclosed recording and only sometimes does this occur:

> Once a person consents to an interview, objectively, there is no measurable increase in invasion of privacy, harassment, or intimidation in the fact that the interview is secretly recorded. Being secret, the tape recording cannot harass or intimidate. Allowing secret tape recording reduces the risk of harassment, intimidation, and loss of privacy. Because the investigator is aware that the conversation is being taped, the investigator will be especially careful to be polite and not harassing or intimidating. Far from finding secret taping by an investigator to be an invasion of privacy, harassment, intimidation, or lacking in respect and dignity, the Alaska Supreme Court has held repeatedly that secret taping by a known person is proper and preferable to no taping.[9] Significantly, the American Bar Association and Alas-

---

**71.** The court found Austin's testimony "particularly credible."

**72.** Alaska Const. art. I, § 24.

**73.** Article I, section 22 provides: "The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section."

ka Bar Association no longer regard secret tape recording by lawyers as unethical or deceitful. (Citation omitted.)

Subjectively, some witnesses suffer a greater affront to their sense of dignity and respect if they learn they were secretly tape recorded. It is difficult to quantify, but most people view an accurate record of a statement without knowledge that it is being made, as something threatening and deceitful. Memories are imperfect, and recollection of what was said precisely is impossible for most people. Thus, not knowing that a tape-recording is made presents a potential future threat. In addition, how a person may say something if there is a tape recording is different, as a statement for posterity may generally be more circumscribed. The State's proffered justifications for prohibiting secret tape recording all involve the way the tape might be used to embarrass a witness at trial. This may be true, but the tape will be used at trial only if it is inconsistent with the witness's trial testimony, and cross-examination is an important part of the adversarial process.

---

[9] *See, e.g., Stephan v. State,* 711 P.2d 1156, 1159–60, 1162 n. 20 (Alaska 1985); *City & Borough of Juneau v. Quinto,* 684 P.2d 127, 129 (Alaska 1984). . . .

Concerning privacy interests, the court found that interviews with disclosed investigators were not private and thus recording them did not compromise privacy interests:

In evaluating the privacy prong, if the statement is voluntary in the first place, as it must be, given this court's decision as to informed consent, objectively, there is no additional privacy interest in a recorded statement. An unrecorded statement may be taken down in the interview as notes or a summary. They may also be reconstructed and added to from the memory of the listener. Just because a recorded

statement may be more accurate does not increase the level of privacy of the speaker. Subjectively, a speaker may feel that a secret tape recording further affected the right to privacy. It may be viewed as a further invasion of the sense of trust, that the tape recording may be used against the speaker.

The State disagrees with the court's conclusions expressed in the excerpts quoted above, arguing that the court's observations amounted to "over-extending the holdings of *Stephan v. State* and *City & Borough of Juneau v. Quinto,*" while ignoring the "chilling effect" that undisclosed tape recording may have on conversations as recognized by this court in *State v. Glass* [74] and *Quinto.* [75] We believe that these arguments are unfounded for the reasons that follow.

This court has recognized that electronic recording of interviews advances the search for truth. In *Mallott v. State* we advised Alaska law enforcement officers that "it is incumbent upon them to tape record, where feasible, any questioning and particularly that which occurs in a place of detention." [76] We based this admonition on the due process based duty to preserve evidence. [77]

After it became apparent that the *Mallott* admonition was not being followed, we held in *Stephan v. State* that the recording of stationhouse interviews should be mandatory. [78] We observed in *Stephan* that recording is "a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self incrimination and, ultimately, his right to a fair trial." [79] We also decried the frequent "swearing match[es]" between interrogating officers and defendants as to what actually had taken place during an interrogation. [80] We concluded that not only does electronic recording provide a defendant "an objective means" "to corroborate [the defendant's] testimony concerning the circumstances of the

---

**74.** 583 P.2d 872 (Alaska 1978).

**75.** 684 P.2d 127 (Alaska 1984).

**76.** 608 P.2d 737, 743 n. 5 (Alaska 1980).

**77.** *Id.*

**78.** 711 P.2d 1156, 1157–58 (Alaska 1985).

**79.** *Id.* at 1159–60.

**80.** *Id.* at 1161.

confession," it also "protects the public's interest in honest and effective law enforcement" and protects the interests of "police officers wrongfully accused of improper tactics." [81]

> A recording, in many cases, will aid law enforcement efforts, by confirming the content and the voluntariness of a confession, when a defendant changes his testimony or claims falsely that his constitutional rights were violated. In any case, a recording will help trial and appellate courts to ascertain the truth. [82]

The upshot of these observations was that recording was thought to be so essential that interviews that were not recorded, in violation of the *Stephan* rule, would be subject to exclusion at trial.[83]

In *Stephan* we recognized that one problem with electronic recording is that, as the State claimed, "recordings tend to have a 'chilling effect' on a suspect's willingness to talk." [84] We suggested as a response to this point that undisclosed recording could be conducted: "[W]hen the ... suspect knows or has reason to know he is speaking to a police officer, there is no constitutional requirement that the suspect be informed that the interview is being recorded." [85]

Given the strong endorsement of electronic recording of interviews in *Stephan*, the State's contention that the superior court "over-extended" *Stephan's* endorsement of electronic recording of interviews is incorrect. The same may be said regarding the State's argument that the superior court misinterpreted *City & Borough of Juneau v. Quinto* [86] and *State v. Glass.* [87]

In *Quinto* this court held that an individual's right to privacy under the Alaska Constitution was not violated when a recording of the individual's conversation with a police officer was admitted where the individual knew that he was talking to a police officer but did not know that the officer was recording the conversation.[88] In *Quinto* we reversed the decision of the court of appeals which had been, in turn, based on a reading of our decision in *Glass.*[89]

We explained the *Glass* holding and the court of appeals's reliance on it as follows:

> In that case we held that it was a violation of a defendant's right to privacy, under article I, section 22 of the Alaska Constitution, for the police to surreptitiously monitor the defendant's conversation with an undercover police informant, without a warrant or other court order, by means of a radio transmitter worn by the informant. Interpreting our decision, the court of appeals "conclude[d] that the warrant requirement of *Glass* must be read to include situations involving routine nonconsensual recording of pre-arrest conversations between citizens and uniformed officers." [90]

We held that the court of appeals had read *Glass* too broadly and that a person in Quinto's position, knowing that he is speaking to a police officer, has no reasonable expectation that the conversation will be private:

> The test for determining whether a person's right to privacy has been invaded under article I, section 22 is two-fold: (1) did the person harbor an actual (subjective) expectation of privacy, and, if so, (2) is that expectation one that society is prepared to recognize as reasonable? For the reasons stated earlier in this opinion we assume, for purposes of our decision, that Quinto harbored an actual (subjective) expectation of privacy. Thus, we must determine only whether Quinto's expectation of privacy in these circumstances is one which society is willing to recognize as reasonable. *Glass* requires nothing more.

---

81. *Id.*

82. *Id.*

83. *Id.* at 1164–65.

84. *Id.* at 1162.

85. *Id.* at 1162 n. 20 (citing *City & Borough of Juneau v. Quinto,* 684 P.2d 127 (Alaska 1984)).

86. 684 P.2d 127 (Alaska 1984).

87. 583 P.2d 872 (Alaska 1978).

88. *Quinto,* 684 P.2d at 128.

89. *Id.*

90. *Id.* (citation omitted).

Article I, section 22 fosters and protects those values and characteristics typical of and necessary for a free society. Some of these are the sharing of thoughts and ideas, personal trust between individuals, free expression, and individuality. While it is certainly true that surreptitious recording of conversations between citizens can have a chilling effect on such forms of freedom, this effect is rendered de minimis when one is aware, or reasonably should be aware, that he or she is speaking to a police officer who is in the process of executing either a lawful arrest or a lawful investigative stop. In such case, one's candor and willingness to share personal confidences are unlikely to be any more effectively chilled than they already are by the added possibility that what is being said may be electronically recorded. [91]

Based on the foregoing, we conclude that the State's criticism of the superior court's interpretation of our case law is unwarranted. We agree with the superior court that undisclosed recording cannot be characterized as harassment or intimidation of witnesses, nor does it invade their privacy. With respect to the latter, what we said in *Quinto* concerning the absence of a reasonable expectation of privacy of a person speaking with a known police officer investigating a crime applies equally to a person speaking to a known defense representative conducting an investigation. A person's privacy interests are no more violated when a defense representative records such a conversation without disclosing that he is recording it than in the case of an undisclosed recording by a police officer.

*Quinto* also answers the "chilling effect" argument offered by the State to the effect that the interests advanced by *Glass*—avoidance of the chilling effect that surreptitious recording of conversations between citizens can have on freedom of expression—applies to interviews between citizens and defense investigators. Just as the possibility of secret tape recording in a police-citizen interaction is unlikely to have a significant effect on what a citizen says, the same is true in a defense investigator—citizen interaction. The important point is that *Glass* was designed to promote free discourse *between citizens* in their everyday conversations. The free-speech values that *Glass* protects do not arise in the guarded context of a criminal investigation where citizens are aware that they are speaking to an investigator.

We also agree with the superior court that the only interest likely to be advanced by the bar on undisclosed recording is the avoidance of the sense of affront, insult, or embarrassment that might be experienced by a witness upon learning that an interview was recorded. Although such feelings are understandable, they are also likely to be temporary. Further, as suggested by the superior court, the feelings become strongest where the recording has the most value—where there are inconsistencies between the witness's interview and the testimony given by the witness at trial. A recorded interview is of great value in demonstrating such inconsistencies and in facilitating cross-examination designed to probe them.[92] A witness's sense of affront or embarrassment is not a detriment of such importance that avoiding it justifies the suppression of evidence that can be preserved by undisclosed electronic recording.[93]

**91.** *Id.* at 129 (citation and footnote omitted).

**92.** As the United States Supreme Court has observed: "Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory." *Dennis v. United States*, 384 U.S. 855, 872 n. 19, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) (quotation omitted).

**93.** *See Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In *Davis* the trial court refused to permit an important prosecution witness to be cross-examined concerning his ju-

venile record. *Id.* at 310–11, 94 S.Ct. 1105. The trial court's ruling was based on a state statute and rule precluding the admission of evidence concerning juvenile convictions. *Id.* at 311, 94 S.Ct. 1105. Although this court affirmed the decision of the superior court, *id.* at 314, 94 S.Ct. 1105, the United States Supreme Court reversed, indicating that the juvenile's interests designed to be protected by the statute and rule were necessarily subordinate to the due process based right to cross-examination. *Id.* at 318, 94 S.Ct. 1105. The Court stated:

Whatever temporary embarrassment might result to Green or his family by disclosure of his

We acknowledge that feelings of affront may be greater upon discovering that one has been tape recorded by a defense investigator in plain clothes than when discovering that one has been tape recorded by a uniformed police officer. The revelation that one has been secretly recorded in a more casual setting may sting, and may compound for a victim her already-existing feelings of victimization. We could wish that investigations and trials were painless affairs, but they are not; and the no-doubt genuine feelings of affront faced by victims and witnesses deserve recognition, however they may be caused. But in the end, such feelings must be balanced against the interests of all in having a fair trial.

We emphasize that AS 12.61.120(c)(1) and AS 12.61.120(d)(1) insofar as it incorporates (c)(1), which we today uphold, require that defense representatives identify themselves and their specific association with the defendant when they seek to interview crime victims and witnesses, putting them on notice of the representative's purpose and role in the same way a police officer's uniform would tend to put them on notice.[94] If defense representatives fail to make these disclosures, or engage in deceptive or misleading tactics, they are subject to sanctions by the trial court. Relatedly, the fact that our decision permits defense representatives to record interviews without disclosing that they are doing so does not mean that trial courts lack authority to take appropriate measures to protect the privacy rights of victims or witnesses when case-specific circumstances indicate a need for protective action. We

stress that courts should be alert to the possibility of such circumstances and take action when they exist.

In summary, we conclude that undisclosed recording is as valuable for defense representatives as it is for the police and that the objections to it are of little weight when compared to its benefits. It would be paradoxical to uphold a law that bars defense representatives from pursuing the practice, while leaving the police and virtually everyone else in the state free to electronically record their conversations without disclosure. We therefore agree with the conclusion of the superior court that the requirements of the act precluding defense representatives from undisclosed electronic recording unduly interfere with a defendant's right to prepare and present a defense.

## IV. CONCLUSION

There are potential tensions between the requirements of due process and the constitutionally based rights of victims and witnesses. No single formula is available for resolving these tensions. But one method that should be helpful is to require that statutes asserting the rights of victims and witnesses conflict to the least degree reasonably possible with the rights of defendants. Another method is to require that where possible such statutes apply to both the prosecution and the defense so that they do not unduly advantage either side. The provisions under review in this case fall short under one or both of these methods.

---

> juvenile record—if the prosecution insisted on using him to make its case—is outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness.
>
> ....
>
> [W]e conclude that the State's desire that Green fulfill his public duty to testify free from embarrassment and with his reputation unblemished must fall before the right of petitioner to seek out the truth in the process of defending himself.
>
> The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness.
>
> *Id.* at 319–20, 94 S.Ct. 1105.

**94.** AS 12.61.120(c)(1) provides: "If a defendant or a person acting on behalf of a defendant contacts the victim of an offense with which the defendant is or could be charged, the person shall clearly inform the victim (1) of the person's identity and specific association with the defendant." AS 12.61.120(d)(1) provides:

> If a defendant or a person acting on behalf of a defendant wishes to make a recording of statements of the victim of an offense with which the defendant is or could be charged in this or another jurisdiction, or of a witness, the person shall, before recording begins, obtain the consent of the victim or witness to record the statement by clearly informing the victim or witness (1) of the information set out in (c) of this section.

For the reasons stated we believe that the provisions under review unjustifiably interfere with defense investigations. Because they present a distinct risk of suppressing sources of evidence that otherwise would be available to defendants, they are inconsistent with procedural due process. With respect to the specific sections of the Victims' Rights Act in question, we rule as follows:

AS 12.61.120(c)(2) and (3) (unsolicited advice)—The judgment of the superior court holding that these provisions are constitutional remains undisturbed with respect to victims of sexual offenses and domestic violence crimes. Except as to such victims, the judgment of the superior court upholding these provisions is reversed.

AS 12.61.125(a)(1) (no contact)—The judgment of the superior court upholding this provision remains undisturbed with respect to victims. The judgment of the superior court upholding this provision as to witnesses is reversed.

AS 12.61.125(a)(2)(B) (written consent)—The judgment of the superior court holding that this provision is unconstitutional is affirmed.

AS 12.61.120(d) and AS 12.61.125(a)(2)(A) (undisclosed electronic recording)—The judgment of the superior court holding that these provisions are unconstitutional is affirmed.

Our conclusion on the merits means that Murtagh is the prevailing party for purposes of an award of attorney's fees and costs. On remand the superior court should make an appropriate award for these items.

AFFIRMED in part, REVERSED in part, and REMANDED for a determination of attorney's fees and costs.

1. Maj. at 609.

2. Maj. at 619.

3. Alaska Const. art. I, § 22. *See also State v. Glass*, 583 P.2d 872 (Alaska 1978); *Anderson v. State*, 555 P.2d 251 (Alaska 1976); *Ravin v. State*, 537 P.2d 494 (Alaska 1975).

4. *Glass*, 583 P.2d at 875. *See also Cowles v. State*, 23 P.3d 1168, 1176 (Alaska 2001) (Fabe, J.,

FABE, Chief Justice, concurring in part and dissenting in part.

CARPENETI, J., not participating.

FABE, Chief Justice, concurring in part and dissenting in part.

I concur with the court's opinion in all respects except one: its conclusion that AS 12.61.120(d)'s ban on surreptitious recording is unconstitutional. On this issue, I believe the court strikes the wrong balance between a defendant's due process right to prepare for trial and a witness's or victim's right to privacy.

The court considers the correct question: "whether the interests served by a statute are of sufficient weight to justify the limitations imposed on [the defendant's] fair trial rights." [1] But the court proceeds to conclude that there are "no substantial countervailing interests ... advanced by the bar on undisclosed recording." [2] I respectfully disagree. The Alaska Constitution [3] establishes a right to privacy that witnesses and victims—indeed, all citizens—enjoy. Surreptitious recording of interviews with witnesses and victims violates that right. In fact, our holding in *Glass* expressed not only a strong policy in favor of privacy, but also one particularly skeptical of surreptitious recording absent a warrant: "We believe that one who engages in a private conversation is similarly entitled to assume that his words will not be broadcast or recorded absent his consent or a warrant." [4]

Surreptitious recording without a warrant has nonetheless been permitted in limited circumstances, namely in the scenario outlined in *Quinto* and its progeny. The court's heavy reliance on these cases to justify a supposed inclination toward surreptitious recording [5] mistakes the exception for the rule. According to the *Quinto* line of cases, war-

dissenting) (noting that in *Glass* "we expressed grave concerns about electronic surveillance technologies and their effect on 'the right of persons to determine for themselves when, how, and to what extent information about them is communicated to others'" (citation omitted)).

5. Maj. at 620–22.

rantless surreptitious recording is allowed by (1) law enforcement officials; (2) conducting a lawful stop or arrest; (3) in their conversations with criminal suspects; (4) when the suspect knows or reasonably should know he is talking to a police officer.[6] Our holding in *Stephan* requiring police officers to record their custodial interrogations of defendants does not depart from these confines.[7]

The logic behind the *Quinto* exception is that criminal suspects lack a reasonable expectation of privacy when they know—or should know—that they are being stopped by a police officer in an official capacity. In a society widely cognizant of *Miranda* rights, people are quite aware that what they say to a police officer after a lawful stop or arrest can be held against them later. Because of this wide awareness, a post-stop or arrest expectation of privacy is unreasonable, and surreptitious recording is therefore permitted. As we noted in *Quinto,*

> [i]n such case, one's candor and willingness to share personal confidences are unlikely to be any more effectively chilled than they already are by the added possibility that what is being said may be electronically recorded.[8]

But conversations with defense attorneys, investigators, or prosecutors do not fit this mold, and I disagree with the court that "the absence of a reasonable expectation of privacy of a person speaking with a known police officer investigating a crime applies equally to a person speaking to a known defense representative conducting an investigation."[9]

As the court's opinion recognizes, "*Glass* was designed to promote free discourse *between citizens.* ..."[10] But the discourse described in *Quinto* was between a police officer and a citizen. Indeed, the *Quinto*

court emphasized that the presence of the police was the crucial element that made surreptitious recording permissible: "The key element, in these cases, is the defendant's awareness that he is in the presence of the police."[11] "The Public Defender Agency, appearing as amicus curiae, argues that it is the fact of recording, not police presence, which is critical to our decision. For the reasons stated in the text of this opinion, we disagree."[12] And here, the interviewees are not suspects who have been stopped by the police—they are witnesses and victims. As *Quinto* recognized, suspects know or should know that what they say in the presence of police during a lawful stop or arrest can be held against them later. Because "the stop was lawful" and because "Quinto knew, or reasonably should have known, that he was speaking to a police officer," we concluded that it should have been clear to Quinto that the officer "was performing his official duties throughout the period covered by the recording." Thus, we held that "Quinto's expectation of privacy, *i.e.* his assumed expectation that his conversation with [the police officer] would not be recorded, is not an expectation which society is willing to accept as reasonable."[13]

Such awareness cannot be attributed to witnesses and victims when they talk to defense investigators, and it is not safe to assume such a conversation will naturally be "guarded," as the court believes.[14] A private conversation between a citizen and a defense attorney or defense investigator, whether private or public,[15] does not fit within the *Quinto* exception. Nor, for that matter, do conversations between a citizen and a prosecutor or paralegal.

---

6. *City & Borough of Juneau v. Quinto,* 684 P.2d 127, 129 (Alaska 1984).

7. *Stephan v. State,* 711 P.2d 1156, 1162 (Alaska 1985).

8. *Quinto,* 684 P.2d at 129.

9. Maj. at 622.

10. Maj. at 622.

11. *Quinto,* 684 P.2d at 129 n. 7.

12. *Id.* at 129 n. 8.

13. *Id.* at 129.

14. Maj. at 622.

15. *See Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (holding that a public defender "does not act 'under color of state law' when performing a lawyer's traditional functions as counsel to an indigent defendant in a state criminal proceeding").

In summary, permitting surreptitious recording is the exception rather than the rule, and *Quinto* involved a limited circumstance: a law enforcement official interrogating a suspect who knew or reasonably should have known that he was talking to a police officer in the course of a lawful stop. Although I agree with the court that the infringement on a defendant's right to prepare for trial must outweigh countervailing interests for the ban to be constitutional, in performing this balancing, the court has incorrectly dismissed the crucial privacy right advanced by the ban as "unsubstantial," characterizing it as nothing more than the protection from temporary feelings of affront that a witness or victim may experience.[16] The protection of witnesses' and victims' privacy is not a trifling endeavor—the Alaska Constitution provides that "the right of the people to privacy is recognized and shall not be infringed."[17] Because protection of privacy rights justifies and outweighs the statutory ban's limitation on the defendant's due process right, I believe that the bar on surreptitious recording is constitutional and should be upheld.